ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

APR 15 2019

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

LACV1902900-MWF-MRWx

UNITED STATES OF AMERICA and THE STATE OF CALIFORNIA *ex rel.* Yvonne Huemoeller, and **YVONNE HUEMOELLER,** individually,

Plaintiffs,

v.

PACIFIC TOXICOLOGY LABORATORIES; ROCCO LANZALOTTA; PARADIGM LABORATORIES, LLC; ETHAN SASZ; VANTARI MEDICAL LLC; VANTARI GENETICS, LLC; GENETIC TECHNOLOGICAL INNOVATIONS, LLC; PACIFIC GENOMICS, LLC; NICHOLAS ARROYO; REHAB ARIZONA, LLC; YURY GAMPEL; ARIZONA FAMILY PHYSICIANS, LLC; GREGORY ELLISON, M.D.; PAINSTOPCLINICS, LLC; BLUE SQUARE RESOLUTIONS, LLC; NICHOLAS GLIMCHER; ADVANCED RX MANAGEMENT, INC.; DISPENSEDOC INC.; CHAD BEENE; TRU COMPOUNDING RX, LLC; and JARED SIMMONS, ESQ.,

Defendants.

DOCKET NO.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff and *qui tam* Relator Yvonne Huemoeller ("Relator"), by and through her undersigned counsel, Brown, LLC and the Law Office of Mann & Elias, alleges of personal knowledge as to her observations and actions, and on information and belief as to all else, as follows:



PAID

APR 15 2019

Clerk, US District Court
COURT 4612

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**I.**
**PRELIMINARY STATEMENT**

1.      Defendants orchestrated and engaged in long-running kickback schemes wherein physicians obtained remuneration in exchange for unnecessary urine drug testing and prescriptions, including prescriptions for opioids and compounded medications.

2.      Under the "buy and bill" scheme, toxicology laboratories performed drug screens on urine samples sent to them by physicians for prices substantially lower than commercial insurance reimbursement rates. The physicians then billed the commercial insurers as if the physicians themselves had performed the testing at their practices, and pocketed the difference between what the insurers paid them and what they paid the laboratories. In exchange, the physicians referred all patients enrolled in government health plans to the laboratories for extensive urine testing, for which the laboratories would bill the government plans directly.

3.      Under the "direct pay" scheme, the physicians referred patients to the laboratories for testing in exchange for monetary payments: medical director salaries, handling fees, and speaker engagement fees.

4.      Under both kickback schemes, Defendants performed unnecessary testing by (a) improperly unbundling tests; (b) testing for unlikely substances; (c) needlessly performing confirmation testing on "negative" samples; and (d) initiating "standing orders" for urine analysis on every patient, regardless of medical necessity.

5.      The Defendant Laboratories paid sales representatives to recruit physicians. These sales representatives were paid based on the volume of and value of the referrals they generated.

6.      Lastly, under various "prescriptions kickbacks" schemes, the physicians ordered controlled substances (including opiates) and expensive compounded medications for their patients from pharmacies in exchange for monetary payments.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

7.      Relator brings this *qui tam* action on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), to recover treble the damages sustained by, and civil penalties and restitution owed to, the United States as a result of Defendants' fraud, including but not limited to violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), and the Physician Self-Referral Law, 42 U.S.C. § 1395nn (the "Stark law").

8.      Relator also bring this action on behalf of the State of California under the California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871 *et seq.* (the "CIFPA") and the California False Claims Act, Cal Gov't Code §§ 12650 *et seq.* (the "California FCA"), to recover treble the damages actually sustained by, and civil penalties and restitution owed to, California and other commercial insurers as a result of Defendants' fraud.

9.      This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendants unless and until the Court so orders. A copy of the Complaint, along with written disclosure of substantially all material evidence and information that Relator possesses, has been served upon the Attorney General of the United States and on the United States Attorney for the Central District of California pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d) and on the Los Angeles County District Attorney and the California Insurance Commissioner pursuant to Cal. Ins. Code § 1871.7(e)(2).

## II.
## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action is brought for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, a federal statute.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

11.     The Court has personal jurisdiction over Defendants because Defendants (a) are residents of, or transact business in, this District; and (b) have carried out their fraudulent scheme in this District.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 (b)(2), because Defendants can be found in, and transact or have transacted business in this District, and the events and omissions that give rise to these claims have occurred in this District.

13.     The Complaint has been filed within the period prescribed by 31 U.S.C. §§ 3730(h)(3) and 3731(b).

### III.
### NO PUBLIC DISCLOSURE;
### DIRECT AND INDEPENDENT KNOWLEDGE
### OF VIOLATIONS OF THE FALSE CLAIMS ACT

14.     There has been no public disclosure, relevant under 31 U.S.C. § 3730(e), of the "allegations or transactions" in this Complaint.

15.     Relator makes the allegations in this Complaint based on her own knowledge, experience and observations.

16.     Relator is the original source of the information on which the allegations herein are based, has direct and independent knowledge of such information, and has voluntarily disclosed such information to the United States and California before filing this action.

### IV.
### THE PARTIES

**A.     The United States**

17.     Plaintiff the United States brings this action by and through Relator. At all times relevant to this Complaint, the United States, acting through the Centers for Medicare & Medicaid Services ("CMS"), has reimbursed Defendants for the provision of various drug tests and

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

prescription medications through the Medicare and Medicaid programs. Furthermore, the United States, acting through the Department of Defense, has reimbursed Defendants through the TRICARE program.

## B.     The State of California

18.     Plaintiff California brings this action by and through Relator. California, through its Medicaid program ("Medi-Cal") has reimbursed Defendants for the provision of drug tests. In addition, private insurers in California have also reimbursed Defendants for the provision of various drug tests and prescriptions, and Relator brings a claim on behalf of California under the CIFPA for fraud upon those private insurers.

## C.     Relator

19.     Relator Yvonne Huemoeller is a citizen of the United States, and a resident of Maricopa County, Arizona. Relator worked as a sales representative for Defendant Pacific Toxicology from approximately December 20, 2010 until September 15, 2015. Relator worked as a sales representative for Defendants Paradigm Laboratories, LLC and Vantari Medical LLC (and its alter-egos and affiliates) from approximately 2015 until 2016. In 2014, Relator served as the Vice President of Medical Sales for Blue Square Resolutions, LLC. Prior to her work as a sales representative, Relator practiced as an independent licensed psychotherapist.

## D.     Defendants

20.     Defendant Pacific Toxicology Laboratories ("PacTox") is a corporation with its principal business address at 9348 De Soto Avenue, Chatsworth, California 91311. PacTox is a toxicology laboratory. In 2017, the California Insurance Commissioner charged 26 physicians and

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

pharmacists in a kickback scheme.[1] Although the Commissioner identified PacTox as being affiliated with the defendants in that scheme, PacTox was not charged.

21.    Defendant Rocco "Jeff" Lanzalotta ("Lanzalotta") is the Chief Executive Officer and a part-owner of PacTox.

22.    Defendant Paradigm Laboratories, LLC ("Paradigm") is a limited liability company with its principal business address at 6117 East Grant Road, Tucson, Arizona 85712. Paradigm is a toxicology laboratory.

23.    Defendant Ethan Sasz ("Sasz") is an owner of Paradigm.

24.    Defendant Vantari Medical LLC ("Vantari Medical") is a limited liability company with its principal business address at 415 South 48th Street, Suite 111, Tempe, Arizona 85281. Vantari also operates a laboratory at 27 Technology Drive, Irvine, California 92618. Vantari Medical is a toxicology laboratory.

25.    Defendant Vantari Genetics, LLC ("Vantari Genetics") is a limited liability company with its principal business address at 4343 East Camelback Road, Suite 210, Phoenix, Arizona 85018. On information and belief, Vantari Genetics is an alter ego of Vantari Medical.

26.    Defendant Genetic Technological Innovations, LLC ("GTI") is a company with its principal business address at 14500 North Northsight Boulevard, Suite 100, Scottsdale, Arizona 85260. GTI also operates a laboratory located at 27 Technology Drive, Suite 101, Irvine, California 92618. On information and belief, GTI is an alter ego of Vantari Medical.

---

[1]   The Commissioner's press release is available at https://www.insurance.ca.gov/0400-news/0100-press-releases/2017/release037-17.cfm (last accessed March 15, 2019). The Commissioner alleged that some of the defendants in that case paid "Pacific Toxicology a flat rate of $60 per test and [billed] the insurance carriers hundreds of dollars per patient."

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

27.     Defendant Pacific Genomics, LLC ("PacGen") is a company with is principal business address at 27 Technology Drive, Suite 100, Irvine, California 92618. On information and belief, PacGen was formerly a division of Vantari Medical.

28.     Defendant Nicholas Arroyo is an owner of Vantari, GTI, and PacGen. On information and belief, Arroyo resides at 1132 White Sails Way, Corona Del Mar, California 92625.

29.     Defendant Rehab Arizona, LLC ("RAZ") is a limited liability company with its principal business address at 303 North Centennial Way, Mesa, Arizona 85201. RAZ also operates another facility at 2919 South Ellsworth Road, Mesa, Arizona 85212. RAZ provides physical therapy and pain management services.

30.     Defendant Yury Gampel ("Gampel") is the owner of RAZ. On information and belief, Gampel has owned RAZ since 2014.  Gampel also owned and operated a medical billing company for pain management services, chiropractic services, physical therapy services outpatient surgery centers, and toxicology and genetic testing services.

31.     Defendant Arizona Family Physicians, LLC d/b/a Advanced Medical Center ("AMC") is a limited liability company located at 2127 East Baseline Road, Suite 104, Tempe, Arizona 85283. AMC is an addiction medicine clinic.

32.     Defendant Gregory Ellison, M.D. ("Ellison"), was a physician and remains an owner of AMC. On information and belief, in 2017, Ellison surrendered his Drug Enforcement Administration ("DEA") license and Arizona medical license after Ellison tested positive for a

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

controlled substance and it was discovered that he had prescribed excessive and medically unnecessary controlled substances to many of his patients that resulted in overdoses.[2]

33.     Defendant PainStopClinics, LLC ("PSC") is a limited liability company headquartered at 9625 East Palomino Place, Sun Lakes, Arizona 85248. PSC operates approximately 11 pain management clinics in Arizona. Pain Stop Clinics use over fifty alter-egos at their eleven pain management clinics in Arizona.

34.     Defendant Blue Square Resolutions, LLC ("Blue Square") is a limited liability company registered in Delaware with its principal place of business located at 15950 North 76th Street, Suite 100, Scottsdale, Arizona 85260. Blue Square holds itself out as a payment system company.

35.     Defendant Nicholas Glimcher ("Glimcher") is a part-owner and manager of Vantari, GTI, PacGen, and Blue Square.

36.     Defendant Advanced Rx Management, Inc. ("Advanced Rx") is a corporation with its principal place of business located at 2430 Camino Ramon, Suite 240, San Ramon, California 94583. Advanced Rx is a pharmacy that provides "point of care" drug dispensing.

37.     Defendant DispenseDoc Inc. ("DispenseDoc") is a Delaware corporation with its principal place of business located at 2 Bala Plaza #300, Bala Cynwyd, Pennsylvania 19004. DispenseDoc is a pharmacy that provides point of care drug dispensing.

38.     Defendant Chad Beene ("Beene") is an owner, founder, and President of DispenseDoc.

---

[2] Ellison took part in the compounded medication scheme with co-conspirator James Chen, the owner of Clevis Management, Inc. d/b/a Haeoyou Pharmacy. Chen has pled guilty to defrauding TRICARE and is currently serving his prison sentence.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

39.     Defendant TRU Compounding Rx, LLC ("TRU") is a limited liability company with its principal place of business located at 8160 East Butherus Drive, Suite 7, Scottsdale, Arizona 85260. TRU is a pharmaceuticals distributer.

40.     Defendant Jared Simmons, Esq. ("Simmons") is an owner of TRU. Simmons is also an attorney who has represented Defendants Paradigm and Vantari.

**V.**
## THE LEGAL FRAMEWORK

**A.    The False Claims Act**

41.     The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, (the "FCA"), reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability for an individual or entity that:

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (C)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid…

31 U.S.C. § 3729(a)(1).

42.     The FCA defines "knowing" to include deliberate ignorance or reckless disregard of the truth or falsity of information. *Id.* § 3729(b)(1).

43.     The FCA defines a "claim" to include any request for money or property that:

> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> > (I) provides or has provided any portion of the money or property requested or demanded; or

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded....

*Id.* § 3729(b)(2)(A)(ii).

44.     For each false claim or other FCA violation, the FCA provides for the assessment of treble damages, plus a civil penalty.[3]

45.     The FCA provides for payment of a percentage of the United States' recovery to a private individual who brings suit on behalf of the United States (the "Relator") under the FCA. *See* 31 U.S.C. § 3730(d).

46.     The FCA also prohibits retaliation against individuals who seek to prevent or report violations of the FCA. *See id.* § 3730(h)(1). An individual who has been retaliated against may recover relief including reinstatement, two times back pay, interest, special damages, and attorney's fees and costs. *See id.* § 3730(h)(2).

**B.     The Medicare and Medicaid Programs**

<u>Program Overview and Provider Enrollment</u>

47.     In 1965 Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for certain healthcare services provided to certain segments of the population. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq.*

48.     The federal Department of Health and Human Services, through CMS, administers

---

[3] 31 U.S.C. § 3729(a)(1)(G) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. 2461 note, substituted a different statutory formula for calculating inflation adjustments on an annual basis. On January 29, 2018, the Department of Justice ("DOJ") promulgated a Final Rule increasing the penalty for FCA violations occurring after November 2, 2015. For such penalties assessed after January 29, 2018, the minimum penalty is $11,181 and the maximum is $22,363. *See* 28 C.F.R. § 85.5; 82 F.R. 3944 (Jan. 29, 2018). The DOJ is expected to publish a penalty increase for 2019, but has not yet done so.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

the Medicare program.

49.     Part B of the Medicare program authorizes payment for outpatient services. Individuals enrolled under Medicare Part B may also receive prescription drug coverage under Medicare Part D. Part D prescription plans are administered by insurance companies receiving contributions from the federal treasury. 42 U.S.C. §§ 1395w-101, *et seq.*

50.     CMS enters into agreements with healthcare providers such as Defendants to establish their eligibility to participate in the Medicare program. Individuals or entities who are participating providers in Medicare may seek reimbursement from CMS for services rendered to patients who are Medicare beneficiaries.

51.     To enroll as an authorized participant in Medicare, a physician is required to make the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me…. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).

Medicare Enrollment Application: Physicians and Non-Physician Practitioners, CMS-855I, at 23.[4]

52.     A clinic or group practice is required to make a substantially similar certification to enroll as an authorized Medicare participant.[5]

53.     Compliance with applicable Medicare program rules and regulations is material to the government's decision to pay and its subsequent payment of claims. In order to be reimbursable

---

[4] *Available* at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf (last accessed March 14, 2019).
[5] *See* CMS-855B, *available at* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms855b.pdf (last accessed March 14, 2019).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

by Medicare, services must be medically necessary, must actually be provided, and must be documented in a manner that allows CMS to determine if the services are properly payable.

The Medicare Claims Process

54.     In order to receive reimbursement from Medicare, providers such as Defendants must submit a claim form. *See* Form CMS-1500.[6] That claim form requires the provider to make the following certification:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete ... 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) **this claim . . . complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment [and] ... 5) the services on this form were medically necessary**....

*Id.*, at 2 (emphasis added).

55.     A provider may also submit the electronic equivalent of this claim form, which contains a substantially similar certification.

56.     CMS guidance as to electronic claims submission is found in Chapter 24 of the Medicare Claims Processing Manual, CMS Publication No. 100-04 (the "Claims Manual").[7] Among other things, the guidance specifies the minimum content of the enrollment form that a local Medicare Administrative Contractor or "MAC"[8] may use to sign up providers to submit claims electronically. Per the Claims Manual, such an enrollment form must contain, and the enrolling provider must acknowledge, at least the following statements:

---

[6] *Available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf (last accessed March 14, 2019).

[7] *Available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf (last accessed March 14, 2019).

[8] A MAC is a private insurer awarded a geographic jurisdiction to process medical claims for Medicare beneficiaries. MAC jurisdictions can be found at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Downloads/MACs-by-State-October-2017.pdf (last accessed March 14, 2019). The current MAC for Defendants' jurisdiction is Noridian Healthcare Solutions, LLC.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

The provider agrees to the following provisions for submitting Medicare claims electronically to CMS or to CMS' A/B MACs or CEDI:

\* \* \*

7. That it will submit claims that are accurate, complete, and truthful;

\* \* \*

12. That it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsified or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law; [and]

\* \* \*

14. That it will research and correct claim discrepancies[.]

Claims Manual, Chapter 24 § 30.2.

57.     The submission of such a certification, if false, is a violation of the FCA. 31 U.S.C. § 3729(a).

58.     Each such false certification is a separate violation of the FCA.

The Medicaid Program

59.     Congress enacted Medicaid under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*

60.     Medicaid is a jointly funded cooperative venture between the federal and state governments to provide health care to certain groups, primarily the poor and the disabled. *See* 42 C.F.R. §§ 430.0 *et seq.* Under the Medicaid program, the federal government pays a specified percentage of each state's Medicaid program expenditures. *See* 42 U.S.C. § 1396d(b).

**C.     The TRICARE Program**

61.     In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. The CHAMPUS program covers active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

62.     In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE."

63.     The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The Defense Health Agency ("DHA") oversees TRICARE.[9]

64.     TRICARE considers billing practices to be fraudulent in cases including (a) unbundling services to increase reimbursement, (b) misrepresenting the identity of the person who rendered the service, and (c) overutilization of services. *See* 32 C.F.R. § 199.9(c).

**D.      The Anti-Kickback Statute**

65.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), (the "AKS") prohibits offering, paying, soliciting, or receiving anything of value to induce the furnishing of any item or service for which payment may be made under a Federal health program.

66.     A violation of the AKS is, in turn, a violation of the FCA. *See* 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]").

**E.      The Stark Law**

67.     The Stark Law, 42 U.S.C. § 1395nn, prohibits physicians from making referrals to an entity, like a toxicology laboratory, if the physician (or the physician's immediate family member) has a financial relationship with the entity. Furthermore, the entity may not present

---

[9] *See* http://www.health.mil/dha (last accessed March 14, 2019).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

claims for reimbursement to federal health programs for services furnished pursuant to such prohibited referrals.

68.     A "financial relationship" between the physician and an entity is defined to include a "compensation arrangement." 42 U.S.C. § 1395nn(a)(2)(B).

69.     Any payment received for a prohibited service must be refunded to Medicare within 60 days from the collection of the payment. 42 C.F.R. §§ 411.353(d), 1003.101.

**F.     The California False Claims Act**

70.     The California False Claims Act (the "California FCA") provides liability for any person who:

> (1)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (2)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.
>
> (3)     Conspires to commit a violation of this subdivision.

Cal. Gov't Code § 12651(a).

71.     The California FCA defines "knowing" to include deliberate ignorance and reckless disregard of the truth or falsity of information. *Id*. § 12650(b)(3).

72.     The California FCA defines a "claim" to include any request for money, property, or service that:

> (B) Is made to a contractor, grantee, or other recipient, if the money, property, or service is to be spent or used on a state or any political subdivision's behalf or to advance a state or political subdivision's program or interest, and if the state or political subdivision meets either of the following conditions—
>
> > (i) Provides or has provided any portion of the money, property, or service requested or demanded.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

>(ii) Will reimburse such contractor, grantee, or other recipient for any portion of the money, property, or service which is requested or demanded.

*Id.* § 12650(b)(1).

73.     Any person violating any of these provisions is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each violation, plus treble damages. *Id.*[10]

## G.     The California Insurance Fraud Prevention Act

74.     The CIFPA prohibits the knowing employment of persons to procure clients or patients to perform or obtain services or benefits under a contract of insurance. *See* Cal. Ins. Code § 1871.7(a).

75.     Furthermore, the CIFPA establishes civil liability for violations of Cal. Pen. Code §§ 549, 550, or 551, which criminalize various forms of insurance fraud.

76.     Cal Pen. Code § 549 provides that it is illegal to solicit, accept, or refer any business to or from any entity with the knowledge that, or with reckless disregard for whether, the entity intends to violate Cal Pen. Code § 550.

77.     Cal. Pen. Code § 550 provides, in pertinent parts, that:

>(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
>
>* * *
>
>(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.
>
>(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.
>
>* * *
>
>(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

---

[10] This penalty is subject to adjustment under the Federal Civil Penalties Inflation Adjustment Act of 1990.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

78.     For each violation of the CIFPA, California assesses a civil penalty of not less than $5,000 and not more than $10,000, plus an assessment of not more than three times the amount of each claim. *See* Cal. Ins. Code § 1871.7(b).

79.     The CIFPA also provides for payment of a percentage of California's recovery to a relator who brings suit on behalf of California . *See id.* § 1871.7(g).

**H.     The Medi-Cal Anti-Kickback Statute**

80.     The Medi-Cal Anti-Kickback Statute (the "Medi-Cal AKS") contains language similar to that of the AKS, and in relevant part establishes criminal liability for: "[a]ny person who offers or pays any remuneration, including, but not restricted to, any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind" either in return for the referral of, or to refer, "any individual to a person for the furnishing or arranging for furnishing of any service or merchandise for which payment made be made, in whole or in part, under [Medi-Cal] …." Cal. Welf. & Inst. Code Ann. § 14107.2.

81.     To participate in Medi-Cal, a provider must sign an agreement to comply with laws including the Medi-Cal AKS. The agreement is a representation of compliance. By violating the Medi-Cal AKS, a provider renders such representation false and thereby violates the CFCA.[11]

---

[11] *See, e.g. New York v. Amgen, Inc.*, 652 F.3d 103, 115 (1st Cir. 2011).

17

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## VI.
## DEFENDANTS' FRAUD

### A.    PacTox's Buy and Bill Scheme

82.    In 2010, at Defendant Ellison's request, PacTox recruited Relator as the sales representative for the Arizona region.

83.    As a sales representative, Relator's job was to recruit physicians to refer their toxicology and genetic testing specimens to PacTox.

84.    Under PacTox's "buy and bill" arrangement, physicians agreed to refer all such testing to PacTox.

85.    PacTox entered into the buy and bill scheme with the following physicians or physician groups: Defendants RAZ; Yury Gampel; Arizona Family Physicians, LLC; Gregory Ellison, M.D.; and PainStopClinics LLC, in Arizona, (collectively, the "Defendant Physicians").

86.    After PacTox completed the testing on the referred specimens, it "sold" the tests back to the Defendant Physicians for patients enrolled in certain commercial insurance plans and certain Medicaid and Medicare managed care plans.

87.    The Defendant Physicians then falsely documented that the tests had been performed at the physicians' offices, and billed for and received reimbursements from insurers accordingly

88.    PacTox instructed the Defendant Physicians to fill out the forms falsely stating that the testing occurred at the physicians' practice addresses. However, the physicians did not have, own, or operate any of the expensive equipment needed to conduct the qualitative and quantitative testing that they billed.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

89.     PacTox generally charged the Defendant Physicians between $50 and $150 per patient specimen.[12] This was substantially lower than the reimbursement per patient the Defendant Laboratories and Defendant Physicians received from insurance plans. As the scheme progressed and the billing methods became more sophisticated, the testing panels grew from 12 drug classes to over 40 drug classes.

90.     In return, the Defendant Physicians agreed to allow PacTox to bill for and collect reimbursements for tests on patients enrolled in government health plans like Medicare, Medicaid, and TRICARE, and for certain commercial plans for which the Defendant Physicians were "out-of-network."

91.     For example, PacTox billed Medi-Cal Health Net for 12 drug tests with a date of encounter ("DOE") of June 16, 2015 for a total of $298.54. These tests were referred to PacTox by Defendant Arizona Family Physicians, LLC d/b/a Advanced Medical Center.

**B.      The Direct Pay Scheme**

92.     The Defendant Physicians entered into kickback arrangements with laboratories other than PacTox.

93.     In 2015, the Defendant Physicians began to refer patients enrolled in government health plans to laboratories including Defendants Paradigm Laboratories, LLC ("Paradigm"); Vantari Medical LLC; Genetic Technological Innovations, LLC; and Pacific Genomics, LLC (the latter three share common ownership and will be collectively referred to as "Vantari").

94.     The Defendant Physicians' arrangement with Paradigm began as a variant of the buy and bill model. The Defendant Physicians referred patients enrolled in commercial health

---

[12] In some cases, PacTox did not even collect payments from the Defendant Physicians for the commercial insurance drug tests. From 2013 to 2014, Rehab Arizona, LLC ("RAZ") accumulated approximately $300,000 of debt with PacTox from purchasing tests. PacTox forgave the full debt to induce RAZ to continue the kickback relationship.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

plans to Paradigm for urine testing, and paid Paradigm $100 for each test. The Defendant Physicians then fraudulently billed the commercial plans at much higher rates, as if they had performed the tests themselves. *See* **Exhibit A**, Paradigm Service Agreement.

95.     In 2016, Paradigm changed its payment model, and instead required the Defendant Physicians to refer all their patients to Paradigm for testing, regardless of the patients' insurance plans. In return, Paradigm paid the Defendant Physicians monthly "handling fees." For example, Paradigm promised to pay Ellison $4,555.96 per moth in handling fees. *See* **Exhibit B**, Paradigm Handling Agreement.

96.     Vantari also provided monetary payments to the Defendant Physicians in exchange for referrals, in the form of medical director salaries, handling fees, and/or speaker engagement fees.

## C.     Unnecessary Testing

97.     To maximize reimbursements, Defendants performed unnecessary testing by (a) improperly unbundling tests; (b) testing for unlikely substances; (c) needlessly performing confirmation testing on "negative" samples; and (d) initiating "standing orders" for urine analysis on every patient, regardless of medical necessity.

98.     The Defendant Physicians generally ordered monthly drugs tests for each of their eligible patients.

99.     Drug tests fall into two categories: qualitative (or presumptive) and quantitative (or confirmatory). The former indicates only the presence or absence of a tested substance and is relatively inexpensive. The latter is able to discern the amount of a tested substance and is generally ordered only when the qualitative test returns a positive result.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

100.   Drug test urine cups commonly feature qualitative testing strips for multiple substances. For example, a 12-panel urine cup contains 12 testing strips that change color, much like a pregnancy test, if the corresponding substances are detected in the urine sample.

101.   When a medical provider conducts a drug test using a multi-panel urine cup, the provider should bill insurers under one bundled billing code.[13]

102.   A medical provider may also choose to test for a specific drug class, such as amphetamines. If so, a provider may bill separately for each drug class.

103.   Even though a multi-panel screen sufficed to test for all of the substances that a particular patient was or might have been taking, the Defendant Physicians deliberately ordered testing for as many drug classes as possible to increase reimbursements.

104.   For example, PacTox provided the Defendant physicians with a customized drug panel form to help them create standing orders for qualitative and quantitative confirmation testing for all their patients. *See* **Exhibit C**, PacTox Custom Panel Form.

105.   The form did not allow physicians to customize drug panels for each patient depending on that patient's needs. Instead, by filling out the form, a physician gave broad authority to PacTox "to screen/quantify patient specimens from [his or her] practice for each of the prescription drug classes ... selected from the list below ...." **Exhibit C**, at 1. In effect, the form is a standing order for every patient from the physician's office.

---

[13] The American Medical Association created the Current Procedural Terminology ("CPT") billing codes, which are used to represent medical procedures claimed for payment. For claims submitted to Medicare and Medicaid, providers use Healthcare Common Procedure Coding System ("HCPCS") codes, which have substantial overlap with CPT codes. The HCPCS/CPT codes used for drug testing have changed substantially throughout the course of Defendants' multi-year scheme. As such, the allegations in this Complaint will refer to the testing in general terms without reference to specific codes.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

106.    In their standing orders to PacTox, the Defendant Physicians commonly ordered that all qualitative tests that came back negative to be confirmed with additional quantitative testing.

**D.    Recruiter Kickbacks**

107.    Relator worked as a sales representative for PacTox; Rocco Lanzalotta; Paradigm; Ethan Sasz; Vantari; GTI; PacGen; Nicholas Arroyo; and Nicholas Glimcher (collectively, the "Defendant Laboratories").

108.    The Defendant Laboratories paid Relator on a commission basis, with pay set as a percentage of the reimbursements that the Defendant Laboratories received from the tests referred by Relator's physician clients. In other words, Relator's pay was determined in a manner that took into account the volume or value of referrals generated between the Defendant Physicians and the Defendant Laboratories.

109.    When Relator began working for PacTox in 2010, PacTox had only three sales representatives nationwide. On information and belief, as of 2016 PacTox had approximately 350 sales representatives nationwide. On information and belief, PacTox pays these sales representatives in the same manner as it paid Relator.

**E.    The Prescriptions Kickbacks Schemes**

<u>Clincare Scheme</u>

110.    In 2014, Defendant Nicholas Glimcher hired Relator to serve as the Vice President of Medical Sales for Defendant Blue Square Resolutions, LLC.

111.    Glimcher hired Relator for the purpose of gaining access to Relator's knowledge of Pactox's buy and bill model and to obtain Relator's contacts, namely the Defendant Physicians.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

112.    Glimcher convinced Defendant Ellison to sign up as a "clinical care coordinator"
for Clincare, LLC d/b/a ClinicalCorp ("Clincare") *See, e.g.* **Exhibit D**, Contract between Ellison
and Clincare, LLC.

113.    A clinical care coordinator's duties were ostensibly to collect and review patient
surveys for Clincare. For this role, Clincare promised to pay Ellison payments of $4,000 per month
for the initial 3-month probationary period, and $8,000 per month thereafter. *See* **Exhibit D**, at 3.

114.    In reality, these payments were meant to induce referrals for compounded
medications.

115.    Clincare held itself out to be a software company. However, Clincare actually
operated a pharmacy in Florida that provided compounded medications. In 2017, nine individuals
who operated Clincare were sentenced for a fraudulent compounded medications scheme that
generated in excess of $172 million.[14]

116.    After Ellison's surveys were filled out and collected, Glimcher told Relator that
Ellison must order a certain number of compounded medications from Clincare in order to receive
his monthly payments. This quota ranged from 30 to 80 prescriptions a month. Prescriptions for
which an insurance claim was denied did not count toward the quota.

117.    Glimcher and Blue Square paid Ellison under the clinical care coordinator contract.

TRU Compounding Scheme

118.    TRU Compounding RX, LLC ("TRU") distributed compounded prescriptions to
Texas pharmacies. TRU is owned by Defendant Jared Simmons, Esq. ("Simmons").

119.    Simmons has also served as an attorney for Defendants Paradigm and Vantari.

---

[14] The Department of Justice's press release is available at https://www.justice.gov/usao-sdfl/pr/nine-people-sentenced-172000000-insurance-fraud-scheme (last accessed March 20, 2019). The United States alleged, *inter alia*, that Clincare's operators provided kickbacks to physicians to induce referrals.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

120.     In 2015, TRU entered into agreements with Defendants Ellison and PainStopClinics under which Ellison and PainStopClinics had to refer patients to TRU's client pharmacies, including Trilogy Pharmacy,[15] for the patients' medications.

121.     In exchange, TRU hired Ellison and several physicians employed by PainStopClinics as medical directors, for which the physicians received payment.

122.     In addition, TRU paid the wages of medical assistants who worked in the offices of Ellison and PainStopClinics.

123.     A week prior to a patient's appointment with either Ellison or PainStopClinics, the aforementioned medical assistants would review the patient's medical records to determine which drugs were covered by the patient's insurance plan. The medical assistants would then pre-fill the patient's records with prescriptions for covered drugs, including controlled substances and compounded medications, without regard for medical necessity. In addition, the medical assistants would write that the patients were to receive urine testing from either Paradigm or Vantari, who were Simmons's clients. When Ellison or PainStopClinics met with their respective patients, they would prescribe drugs and order urine testing as pre-determined by their respective medical assistants, and send orders for these drugs and testing to TRU and Simmons' clients.

Point of Care Dispensing Schemes

124.     Defendants Advanced Rx Management, Inc. ("Advanced Rx") and DispenseDoc Inc. ("DispenseDoc") are "point of care" pharmacies that deliver stocks of drugs, including controlled substances, directly to physician's offices. This service allows patients to pick up their

---

[15] The owner and president of Trilogy Pharmacy were charged for their roles in a $100 million TRICARE fraud scheme. The DOJ's press release is available at https://www.justice.gov/usao-ndtx/pr/ten-additional-defendants-charged-100-million-tricare-fraud-scheme.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

medications immediately after receiving a prescription. After the drugs are dispensed, Advanced Rx and DispenseDoc bill the patients' insurance plans for reimbursement.

125.    In 2015, Advanced Rx entered into an agreement with Defendant Ellison in which Advanced Rx paid Ellison financial kickbacks for all drugs that were dispensed at Ellison's office and supplied by Advanced Rx.

126.    The payment agreement between Advanced Rx and Ellison was structured as a "software licensing agreement."

127.    Under this agreement, Ellison wrote drug prescriptions, including those for opioids, that were filled by Advanced Rx's stocks at Ellison's office.

128.    In 2016, Ellison ended the agreement with Advanced Rx.

129.    Thereafter, Ellison entered into a substantially similar agreement with DispenseDoc, which is owned and operated by Defendant Chad Beene ("Beene"). Ellison wrote drug prescriptions, including those for controlled substances, that were filled by DispenseDoc's stocks at Ellison's office. In return, DispenseDoc promised Ellison financial kickbacks.

130.    In 2017, the agreement between Ellison and DispenseDoc ended.

**COUNT I**
**(All Defendants)**
**FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS**

131.    As alleged above, Defendants presented or caused to be presented claims to federal health plans for drug tests and/or prescription drugs furnished in violation of the AKS and the Stark Law. Each such claim is a false claim under the FCA.

132.    Accordingly, Defendants knowingly presented or caused false or fraudulent claims to be presented to the United States for payment in violation of 31 U.S.C. § 3729(a)(l)(A).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

133.    The submission of these false claims caused the United States to pay out monies that it would not have paid if it had known of the falsity of these claims.

134.    Each false or fraudulent claim submitted to the United States is a separate violation of the FCA.

135.    By reason of the false or fraudulent claims that Defendants knowingly presented, the United States has been damaged in an amount to be proven at trial.

### COUNT II
### (All Defendants)
### FEDERAL FALSE CLAIMS ACT: MAKING OR USING
### FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID

136.    As alleged above, Defendants knowingly used false records and statements material to the false or fraudulent claims that they submitted for payment.

137.    Accordingly, Defendants knowingly used false records or statements material to false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(l)(B).

138.    The submission of these false claims caused the United States to pay out monies that it would not have paid if it had known of the falsity of these claims.

139.    Each false or fraudulent claim submitted to the United States is a separate violation of the FCA.

140.    By reason of the false or fraudulent claims that Defendants knowingly presented, the United States has been damaged in an amount to be proven at trial.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## COUNT III
### (All Defendants)
### FEDERAL FALSE CLAIMS ACT:
### CONSPIRACY TO GET A FALSE CLAIM PAID

141.     As alleged above, the Defendant Laboratories conspired with the Defendant Physicians to submit false claims to federal health programs for drug tests furnished in violation of the AKS.

142.     Defendants Glimcher and Blue Square conspired with Ellison to submit false claims to government health programs for compounded medications ordered in violation of the AKS.

143.     Defendants TRU and Simmons conspired with Ellison and PainStopClinics to submit false claims to government health programs for medications, including controlled substances, ordered in violation of the AKS.

144.     Defendant Advanced Rx, DispenseDoc, and Beene conspired with Ellison to submit false claims to government health programs for medications, including controlled substances, ordered in violation of the AKS.

145.     Accordingly, Defendants conspired to submit false claims in violation of 31 U.S.C. § 3729(a)(l)(C).

146.     As a result of this conspiracy, the United States has been damaged in an amount to be proven at trial.

## COUNT IV
### (All Defendants)
### CALIFORNIA FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

147.     As alleged above, Defendants presented or caused to be presented claims to Medi-Cal for drug tests and/or prescription drugs furnished in violation of the Medi-Cal AKS. Each such claim is a false claim under the CFCA.

27

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

148.    Accordingly, Defendant knowingly presented or caused false or fraudulent claims to be presented to Medi-Cal for payment in violation of Cal. Gov't Code § 12651(a)(1).

149.    The submission of these false claims caused California to pay out monies that it would not have paid if it had known of the falsity of these claims.

150.    Each false or fraudulent claim submitted to California is a separate violation of the CFCA.

151.    By reason of the false or fraudulent claims that Defendant knowingly presented, California has been damaged in an amount to be proven at trial.

**COUNT V**
**(All Defendants)**
**CALIFORNIA FALSE CLAIMS ACT: MAKING OR USING**
**FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID**

152.    As alleged above, the Defendants knowingly used false records and statements, including false documentation material to the false or fraudulent claims that they submitted for payment to Medi-Cal.

153.    Accordingly, Defendants knowingly used false records or statements material to false or fraudulent claims for payment, in violation of Cal. Gov't Code § 12651(a)(2).

154.    The submission of these false claims caused California to pay out monies that it would not have paid if it had known of the falsity of these claims.

155.    Each false or fraudulent claim submitted to California is a separate violation of the CFCA.

156.    By reason of the false or fraudulent claims that Defendants knowingly presented, California has been damaged in an amount to be proven at trial.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## COUNT VI
### (All Defendants)
### CALIFORNIA FALSE CLAIMS ACT:
### <u>CONSPIRACY TO GET A FALSE CLAIM PAID</u>

157.    As alleged above, the Defendant Laboratories conspired with the Defendant Physicians to submit false claims to Medi-Cal for drug tests furnished in violation of the Medi-Cal AKS.

158.    Defendants Glimcher and Blue Square conspired with Ellison to submit false claims to government health programs for compounded medications ordered in violation of the Medi-Cal AKS.

159.    Defendants TRU and Simmons conspired with Ellison and PainStopClinics to submit false claims to government health programs for medications, including controlled substances, ordered in violation of the Medi-Cal AKS.

160.    Defendant Advanced Rx, DispenseDoc, and Beene conspired with Ellison to submit false claims to government health programs for medications, including controlled substances, ordered in violation of the Medi-Cal AKS.

161.    Accordingly, Defendants conspired to submit false claims in violation of Cal. Gov't Code § 12651(a)(3).

162.    As a result of this conspiracy, California has been damaged in an amount to be proven at trial.

29

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## COUNT VII
### (Defendant Laboratories)
## CALIFORNIA INSURANCE FRAUD PREVENTION ACT:
### <u>EMPLOYMENT OF PERSONS TO PROCURE CLIENTS</u>

163.    As alleged above, the Defendant Laboratories knowingly employed persons, including Relator, to procure physicians clients to obtain services or benefits under a contract of insurance.

164.    Accordingly, the Defendant Laboratories have violated Cal. Ins. Code § 1871.7(a).

165.    As a result, California has been damaged in an amount to be proven at trial.

## COUNT VIII
### (All Defendants)
## CALIFORNIA INSURANCE FRAUD PREVENTION ACT:
### <u>INSURANCE FRAUD</u>

166.    As alleged above, Defendants engaged in the following conduct:

    a)    Did, aided, abetted, solicited, or conspired to:

        i.    Knowingly prepare, make, or subscribe any writing with the intent to present or use it, or allow it to be presented, in support of false or fraudulent claims; and

        ii.    Knowingly make or cause to be made false or fraudulent claims for payment of a health care benefit.

    b)    Did, or knowingly assisted or conspired to:

        i.    Present or caused to be presented any oral or written statement as part of or in support of a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contained any false or misleading information concerning any material fact; and

        ii.    Prepare or make any written oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contained false or misleading information concerning any material fact.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

      c)     Solicited, accepted, or referred any business to or from any entity with the knowledge that, or with the reckless disregard for whether, the entity intends to violate the foregoing paragraph (a) or (b).

167.    Accordingly, Defendants have violated Cal. Pen. Code §§ 549, 550. These violations give rise to civil liability under Cal. Ins. Code § 1871.7(b).

168.    As a result, California has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator respectfully requests that this Court enter judgment in her favor and that of the United States and California and against Defendants, granting the following on all Counts:

(A)    an award to the United States for treble its damages, a statutory penalty for each violation of the FCA, and for its costs pursuant to 31 U.S.C. § 3729(a)(3);

(B)    an award to California for treble its damages and a statutory penalty for each violation of the CIFPA pursuant to Cal Ins. Code § 1871.7(b), and for its costs pursuant to Cal Ins. Code § 1871.7(g)(1)(A)(ii);

(C)    an award to Relator in the maximum amount permitted under 31 U.S.C. § 3730(d) and Cal. Ins. Code § 1871.7(g)(1)(A)(i), and for the reasonable attorneys' fees and costs she incurred in prosecuting this action;

(D)    awards to the United States, California, and Relator for pre- and post-judgment interest at the rates permitted by law; and

(E)    such other and further relief as this Court may deem to be just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by jury on all questions of fact raised by the Complaint.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Dated: April 15, 2019

Respectfully submitted,

**Brown, LLC**
**(Lead Counsel)**

**By:** */s/ Jason T. Brown*
Jason T. Brown
    (*pro hac vice* application forthcoming)
Benjamin Lin
    (*pro hac vice* application forthcoming)
Patrick S. Almonrode
    (*pro hac vice* application forthcoming)
(877) 561-0000 (office)
(855) 582-5297 (fax)
*jtb@jtblawgroup.com*
*ben.lin@jtblawgroup.com*
*patalmonrode@jtblawgroup.com*

**LAW OFFICE OF MANN & ELIAS**
**(Local Counsel)**

**By:** */s/ Imad Y. Elias*
Imad Y. Elias
6100 Wilshire Blvd., Suite 1104
Los Angeles, CA 90048
(323) 857-9500 (office)
(323) 857-9525 (fax)
*imad @mannelias.com*

*Attorneys for Relator*

32

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2019, I caused a true copy of the Complaint in the matter captioned *United States of America ex rel. Yvonne Huemoeller v. Pacific Toxicology Laboratories., et al.* to be served upon the following, along with written disclosure of substantially all material evidence and information possessed by Relator:

*by USPS Registered Mail, Return Receipt Requested, to*

Nicola T. Hanna
United States Attorney's Office
Central District of California
300 North Los Angeles Street, Suite 7516
Los Angeles, California 90012

Office of the Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jackie Lacey
District Attorney's Office
Los Angeles County
211 West Temple Street, Suite 1200
Los Angeles, CA 90012

Fraud Liaison Bureau
California Insurance Commissioner
California Department of Insurance
45 Fremont Street
San Francisco, CA 94105

*/s/ Jason T. Brown*
Jason T. Brown

# EXHIBIT A



# SERVICES AGREEMENT

This Services Agreement ("Agreement") is entered into this 9th day of November 2015, by and between Paradigm Laboratories and Gregory Ellison, MD (client).

RECITALS

A. Paradigm Laboratories wishes to market, administer, and bill for certain Toxicology testing laboratory services.

B. Paradigm Laboratories is a CLIA certified laboratory providing genetic, toxicology, and other laboratory tests.

C. Paradigm Laboratories and client desire to enter into an arrangement whereby: i) client refers patient test to Paradigm Laboratories, ii) Paradigm Laboratories conducts and reports laboratory test, and ii) Client compensates Paradigm Laboratories for test and bills commercial payors.

D. This Agreement shall apply to all private or commercial payors and shall exclude any and all governmental payors, including Medicare.

AGREEMENT

For and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1. TestingMenu**

The testing menu for this Agreement is attached hereto as Schedule 1 and consists of Paradigm Laboratories standard toxicology test requisitions, which may be updated from time to time.

**2. Responsibilities.** The parties agree to undertake the obligations as provided

below: a. Paradigm Laboratories shall perform the Tests when ordered by client and provide test results to:

Client.

b. Client shall seek reimbursement from commercial payors through its normal reimbursement process and shall at all times comply with federal and state requirements. Client will provide all reasonably requested assistance with these arrangements.

1

## 3. Compensation

a. Client shall compensate Paradigm Laboratories, on a per specimen test (T) basis, in accordance with the following table regardless of whether claim is reimbursed by a third party payor:

b. Client agrees to compensate Paradigm Laboratories within thirty (30) days of receipt of services invoiced.

c. Any specimen that client is unable to receive reimbursement for, client can submit patient insurance and demographic information for Paradigm Laboratories to bill and reverse $100 specimen fee that they were assessed. *As long as this is done within timely filing guidelines set forth by individual insurance carriers (usually between 30-90 days from DOS)

## 4. Compliance

a. The parties acknowledge and agree that:

i. The services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the Agreement.

ii. Nothing herein is intended to interfere with or skew clinical decision- making, or result in overutilization or inappropriate utilization of services.

iii. Each party and its employees and agents shall provide information to decision-makers, prescribers, or patients that is complete, accurate, and not false or

misleading.

iv. Each party and its employees and agents shall seek to promote patient safety and quality of care.

v. The compensation provided for in the Agreement shall be consistent with fair market value in arm's-length transactions.

vi. As to regulatory matters, each party, on its own behalf, acknowledges and agrees that:

vii. It and its employees and agents shall comply with all applicable laws and regulations in performing its respective obligations under the Agreement, including, without limitation, all applicable federal and state anti-kickback laws, anti-self-referral laws, and health information privacy and confidentiality laws.

| Service Provided | |
|---|---|
| Toxicology Testing | $100.00 per specimen |

2.

ii. Neither it nor any of its employees or agents, to the knowledge of such party, have engaged in any activities which are prohibited, or are would be cause for civil penalties or mandatory or permissive exclusion from Medicare, Medicaid, or any other State Health Care Program or Federal Health Care Program (as those terms are defined in 42 C.F.R. § 1001.2) under 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b, or 1395nn, 18 U.S.C. § 1347, or 1035, or 31 U.S.C. § 3729-3733 (known as the Federal Civil False Claim Act), or the regulations promulgated pursuant to such statutes, including the submission of any claim in connection with any referrals that violate the Federal Physician Self-Referral ("Stark") law under 42 U.S.C. § 1395nn, including not having experienced any of the following: (i) a civil monetary penalty assessed against it under 42 U.S.C. § 1320a-7a or any applicable state Law; (ii) been excluded from participation under Medicare, Medicaid or any other State Health Care Program or Federal Health Care Program under 42 U.S.C. §§ 1320a-7 or 1320a-7a or any applicable Law or any third-party payor program; (iii) been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of the offenses described in 42 U.S.C. §§ 1320a-7(a) and (b)(1), (2), (3), or any applicable state Law that could lead

to a mandatory or permissive exclusion from any State Health Care Program or Federal Health Care Programs; (iv) been suspended, debarred, or excluded from any federal program under 45 C.F.R. Part 76 or from any state program under any similar applicable state Law; or (v) been subject to any action under the Federal Civil False Claim Act, 42 U.S.C. § 1320a-7b, or any applicable state false claim or fraud Law.

iii. Neither it nor any of its employees or agents have received from any individual, nor from the U.S. Department of Health and Human Services or any other federal, state, or local government department or agency, any complaint, notice or other notification of a complaint, regarding its compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") or any other law or regulation applicable to health information.

iv. Neither it nor any of its employees or agents have submitted any claim to any government program in connection with any referrals that violated the Federal Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn, and the regulations promulgated thereunder.

v. Neither it nor any of its employees or agents have knowingly or willfully solicited, received, paid or offered to pay any illegal remuneration, directly or indirectly, overtly or covertly, in cash or in kind, for any referral in violation of any Law, including the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320(a)-7b(b), and the regulations promulgated thereunder (commonly known as the "Anti-Kickback Statute"), or any applicable state anti-kickback Law.

3

vii. Neither it nor any of its employees or agents have submitted any claims or aided in the submission of any claims to Medicare seeking reimbursement for services for which it knows that another health care provider, entity, or person also has submitted a claim seeking reimbursement.

viii. Neither it nor any of its employees or agents have submitted any claims or aided in the submission of any claims for payment to any payor source, either governmental or non-governmental, in violation of the Federal Civil False Claims Act, 42 U.S.C. § 1320a-7b, or any applicable state false claim or fraud Law.

## 5. Term and Termination

a. This Agreement shall commence on the date set forth above and shall remain in effect until the one year anniversary of the date of this Agreement. Thereafter, the term of this Agreement shall automatically renew for successive 12 month periods unless either party gives the other party written notice of its intent not to renew no less than 30 days prior to the expiration of the then current term.

b. Either party may terminate this Agreement as follows:

i. upon 60 days written notice to the other party; or

ii. at any time in the event the other party terminates or suspends its business, becomes subject to any bankruptcy or insolvency proceeding under Federal or state statute, or becomes subject to direct control by a trustee or similar authority.

c. This Agreement may be terminated upon the mutual agreement of the parties.

## 6. Confidentiality

In the course of this relationship, it is anticipated that each party will learn information that the other party regards as confidential or proprietary (collectively, "Proprietary Information"). Except as may be necessary in the ordinary course of performing the duties under this Agreement, each party will keep confidential all Proprietary Information acquired with respect to the other's business and will not use the Proprietary Information of the other party except for purposes contemplated by this Agreement. Notwithstanding the foregoing, this Agreement shall not apply to any disclosures of Proprietary Information (i) which is or becomes generally known to the public through no fault of the receiving party; (ii) is subsequently rightfully obtained by the receiving party from a third party, provided said third party did not derive such information from receiving party or at receiving party's request and is otherwise legally permitted to disclose such Proprietary Information; or (iii) pursuant to any court order or other operation of law.

Each party acknowledges and agrees that the covenants and agreements contained in this Section are reasonable, and agree that they shall not raise any issue of their reasonableness in any proceeding to enforce such covenants and agreements. Each party agrees that any violation or

4

*NOT INCLUDING Yvonne Huemoller, m*

breach by them and/or their representatives of this Agreement would cause
immediate and irreparable harm, the exact amount of which will be impossible to
ascertain, and for that reason further agrees that an injured party shall be entitled,
as a matter of right, to an injunction issued by any court of competent jurisdiction,
restraining any further violation or breach of this Agreement by either party and/or
their representatives, either directly or indirectly, such right to an injunction being
cumulative and in addition to whatever remedies either party may have under
applicable law and/or this Agreement.

The obligations of this Section shall survive termination.

**7. Indemnification**

Each party shall indemnify the other party from any and all Claims arising from or
related to its employees' and agent's negligence or willful misconduct or any breach
of any representation, warranty or covenant under this Agreement. As used in this
Agreement, "Indemnify" means to indemnify, defend and hold harmless the
indemnified party (including each of its officers, directors, employees and agents).
"Claims" means all claims, actions, demands, losses, findings, causes of action,
penalties, determinations, and fines, including reasonable attorneys' fees. The
obligations of this Section shall survive termination. Any party seeking
indemnification hereunder shall provide the other party with prompt notice of any
Claim for which indemnification will be sought, control over the investigation,
defense or settlement of any such Claim (provided that no settlement that contains
obligations other than the payment of cash shall be entered without the consent of
the indemnified party, such consent not to be unreasonably withheld), and
reasonable cooperation regarding the investigation, defense or settlement of any
such Claim.

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER OR
WITH RESPECT TO THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL,
EXEMPLARY, SPECIAL, OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT
LIMITED TO LOSS OF PROFITS OR BUSINESS INTERRUPTION, OR PUNITIVE
DAMAGES.

**8. OtherProvisions**

a. *Status as Independent Contractor.* Client and Paradigm Laboratories are contractors independent of one another and neither party's employees will be considered employees of the other party for any purpose. This Agreement does not create a joint venture or partnership.

b. *Applicable Law and Forum.* This Agreement shall be governed and construed in accordance with the laws of the State of Arizona without regard to its conflict of laws provisions, and the parties hereto consent to Tucson, Arizona, as the proper venue and jurisdiction for the resolution of any disputes arising hereunder.

c. *Notices.* Any notice or other communication required or permitted under this Agreement shall be given in writing and delivered by hand, by overnight courier, or by registered

5

or certified mail, postage prepaid and return receipt requested, to the following persons (or their successors pursuant to due notice):

If to Paradigm Laboratories:

Paradigm Laboratories  6117 E. Grant Rd.  Tucson, Arizona  Attention: Perry Comeau

If to Client

d. *Amendment; Waiver.* This Agreement may not be amended except in writing signed by both parties. No waiver by either party of any breach by the other party of any of the provisions of this Agreement shall be deemed a waiver of any preceding or succeeding breach of the same or any other provisions hereof. No such waiver shall be effective unless in writing and then only to the extent expressly set forth in writing.

e. *Headings.* The headings in this Agreement are finding aids only and shall have no effect on the meaning of the terms of this Agreement.

f. *Modifications.* No modification of this Agreement shall be effective unless in writing and signed by both parties.

g. *Severability.* If any provision of this Agreement is invalid or unenforceable under any statute or rule of law, the provision is to that extent to be deemed omitted, and the remaining provisions shall not be affected in any way.

h. *Interpretation.* The parties acknowledge that this Agreement is the product of negotiations between the parties, that each party has had the opportunity for review of this Agreement by legal counsel of its selection, and that neither party shall be deemed the drafter of this Agreement for purposes of contract interpretation.

i. *Assignment.* This Agreement shall not be assigned, delegated, or transferred by either party without the prior written consent of the other party. Notwithstanding the foregoing, Client, without prior written consent, may assign the Agreement in the event Client is acquired through a stock purchase, sale of substantially all the assets or other manner of acquisition.

j. *Force Majeure.* Client shall not be liable for any claims or damages if such claims or damages result or arise out of a failure or delay that is due to any act beyond the control of the Client.

k. *Entire Agreement.* This Agreement, including all Exhibits attached hereto, constitutes the entire agreement between Client and Paradigm Laboratories.

6

l. *Authority, Counterparts.* Each person signing this Agreement covenants that he or she is duly authorized by all necessary and appropriate corporate actions to execute this Agreement. The parties may execute this Agreement in counterparts and, without limitation, may deliver executed copies by electronic transfer.

m. *Attorneys' Fees.* If any litigation shall ever occur between the parties arising from or related to this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs from the non-prevailing party. This includes, without limitation, the recovery of any reasonable attorneys' fees and costs incurred in addressing violations of this Agreement prior to litigation.

**Signature page follows.**

7

IN WITNESS WHEREOF, and in acknowledgment that the parties hereto have read, understood, and agreed to each and every provision hereof, the parties have executed this Services Agreement on the date first set forth above.

**Client**

Paradigm Laboratories

Ethan Sasz, CEO


_____,          \_\_\_\_ / \_\_\_\_ / \_\_\_\_
Signature Name, Title, Date



Gregory Ellison, MD
Advanced Medical Center
2127 E. Baseline Rd.
Tempe, Arizona  85283

Signature Name/Title

# EXHIBIT B



# Paradigm Laboratories, LLC

## HANDLING AGREEMENT

This HANDLING AGREEMENT ("Agreement") is made as of the **9th day of March 2016** ("Effective Date"), by and between **Dr. Gregory Ellison: Advanced Medical Center** ("PROVIDER"), and Paradigm Laboratories, LLC, an Arizona limited liability company ("CONTRACTOR").

## RECITALS

WHEREAS, PROVIDER, through its physicians, specializes in various areas of medical treatment; and

WHEREAS, CONTRACTOR is an independent contractor having its principal place of business at 6117 E. Grant Road, Tucson, Arizona 85712;

WHEREAS, CONTRACTOR is in the business of medical and diagnostic testing, including various testing products and services that are offered by PROVIDER to patients (the "Tests") as a component of medical care or treatment plans; and

WHEREAS, PROVIDER and CONTRACTOR wish to enter into an agreement pursuant to which, during the term of this Agreement, PROVIDER will collect samples or specimens from its patients, at the sole discretion of PROVIDER's physicians (the "Test Samples"), and will prepare such Test Samples for delivery and shipment to the laboratory operated by CONTRACTOR, in exchange for compensation, on the terms and conditions set forth herein;

WHEREAS, the parties acknowledge that the preparation, performance, delivery and/or shipment of the Test Samples requires PROVIDER to expend physician and/or staff time and efforts, for which CONTRACTOR will compensate PROVIDER for the fair market value of such time and efforts in accordance with the terms hereof; and

NOW, THEREFORE, in consideration for the mutual covenants herein contained and further good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to bound hereby, the parties hereto agree as follows:

## ARTICLE 1.  SERVICES OF EACH PARTY

**Section 1.01**   Services of PROVIDER

(a) <u>Determination and Explanation of Tests</u>.   During the Term of this Agreement, PROVIDER shall determine the Tests to be prescribed for its patients (the "Patients") in connection with which Test Samples may be required, in the sole discretion of its physicians, and shall explain the purpose and benefit of the Test(s) and the manner of collecting the Test Samples.

(b) <u>Follow Instructions</u>.   PROVIDER shall strictly adhere to the instructions of CONTRACTOR, or its salespersons or delegates, with regard to collecting, handling and delivery of Test Samples.

(c) <u>Required Paperwork</u>.   PROVIDER shall complete all paperwork associated with the Test Samples, as required by CONTRACTOR from time to time.

1

    (d)    <u>Mailing/Delivery</u>.  PROVIDER shall prepare and complete all information relating to each of the Test Samples, including any required paperwork, and ensure timely delivery to, or pick up, by a reliable courier, which shall deliver each Test Sample to the laboratory designated by CONTRACTOR.

    (e)    <u>Log</u>.  PROVIDER shall complete and maintain a log of each Test Sample collected and delivered to CONTRACTOR under this Agreement in such form as reasonably determined by CONTRACTOR.

**Section 1.02**    <u>Services of CONTRACTOR</u>.  During the Term of this Agreement, CONTRACTOR agrees to compensate PROVIDER the handling fee of **$4,555.96 per month** (the "Monthly Handling Fee").

**Section 1.03**    <u>Billing and Payment</u>.  During the Term of this Agreement, on or before the 45th day after the immediately preceding calendar day of each month, CONTRACTOR shall pay to PROVIDER the Monthly Handling Fee.

## ARTICLE 2.  RELATIONSHIP OF THE PARTIES

**Section 2.01**    <u>Independent Contractor</u>.  The parties to this Agreement intend that the relationship between them created by this Agreement is that each party will at all times be acting and performing as an independent contractor for the other party.  No agency, employment or partnership, is created by this Agreement.  PROVIDER's business is separate and apart from the business operated by CONTRACTOR.  Except as set forth herein, neither party shall have authority to act for the other in any manner to create obligations or debts binding on the other and neither party shall be responsible for any obligations or expenses whatsoever of the other.

## ARTICLE 3.  TERM

**Section 3.01.**    Services under this Agreement shall begin on **March 1, 2016** and will continue until **February 28, 2017**, *(one year)* unless sooner terminated as herein provided. After one year, there will be a reevaluation based on any changes to MGMA Fair Market Value Rates and/or changes to the practice.

## ARTICLE 4.  OBLIGATIONS OF PARTIES

**Section 4.01**    <u>Compliance with Applicable Statutes, Ordinances, and Regulations</u>.  The parties hereto agree to comply with any applicable federal, state or local laws or regulations that have or may become effective during the term of this Agreement.  PROVIDER shall perform all services under this Agreement in accordance with any and all regulatory and accreditation standards, including, without limitation, those requirements imposed by Medicare/Medicaid, conditions of participation therein and any amendments thereto, and all applicable federal, state and local laws, rules, regulations and policies.

**Section 4.02**    <u>Security and Confidentiality of Personally Identifiable Health Information</u>.  Without limiting the provisions of Section 4.01 above, and as applicable under their respective obligations as set forth in Administrative Simplification subtitle of the Health Insurance Portability and Accountability Act ("HIPAA" as the same may be amended from time to time), the parties agree to take any and all reasonable steps necessary to secure and maintain as "confidential" the individually identifiable health information of Patients exchanged between the parties in carrying out their respective obligations under this Agreement (the "Patient Information"). The party having knowledge of any unauthorized or improper uses or disclosures made while performing the obligations hereunder, whether such disclosure is made by such party or by the other, such party shall report such unauthorized use or disclosure to the other party. In the event that either party subcontracts the services required to be performed under this Agreement (to the extent allowed by this Agreement), the subcontracting party shall, as appropriate and applicable,

2

require subcontractors handling Patient Information to comply with these requirements and any other additional requirements of "Business Associates" as set forth in HIPAA. Upon request, the parties agree to make available to the requesting party copies of any documentation or other information relevant to the safeguarding of Patient Information. The parties agree that this Agreement may be amended as necessary to comply with applicable laws and regulations regarding the security, privacy and confidentiality of individually identifiable health information.

## ARTICLE 5. RENEWAL AND TERMINATION OF AGREEMENT

**Section 5.01** This Agreement shall be automatically renewed for additional twelve month terms ("Renewal Terms") thereafter unless either party gives written notice of cancellation thereof to the other party at least thirty (30) days prior to the expiration of the then current Term or Renewal Term. Neither CONTRACTOR nor PROVIDER shall be required to perform any of the services set forth herein after the termination of this Agreement.

**Section 5.02**     In the event of a breach of this Agreement, which is not cured within 10 days of written notice of such breach, either party may terminate this Agreement by written notice to the other party. After the initial Term, either party may terminate this Agreement for any reason by providing the other party written notice of such termination thirty (30) days prior to the effective date of termination.

## ARTICLE 6. GENERAL PROVISIONS

**Section 6.01** Legal Compliance.

a. The parties acknowledge and agree that:

i. The services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the Agreement.

ii. Nothing herein is intended to interfere with or skew clinical decision- making, or result in overutilization or inappropriate utilization of services.

iii. Each party and its employees and agents shall provide information to decision-makers, prescribers, or patients that is complete, accurate, and not false or misleading.

iv. Each party and its employees and agents shall seek to promote patient safety and quality of care.

v. The compensation provided for in the Agreement shall be consistent with fair market value in arm's-length transactions.

b. As to regulatory matters, each party, on its own behalf, acknowledges and agrees that:

i. It and its employees and agents shall comply with all applicable laws and regulations in performing its respective obligations under the Agreement, including, without limitation, all applicable federal and state anti-kickback laws, anti-self-referral laws, and health information privacy and confidentiality laws.

ii. Its employees and agents are not currently debarred, excluded or otherwise ineligible to participate in a governmental program by the Office of Inspector General of the Health and Human Services, by the Food and Drug Administration, and by the General Services Administration and are not, to the best of its knowledge, under investigation or otherwise aware of any circumstances which may result in Paradigm Laboratories being excluded from participation in such programs. These lists are accessible at

3

http://exclusions.oig.hhs.gov, http://www.fda.gov/ora/compliance_ref/debar/default.htm and http://www.epls.gov/index.html. In the event that either party, any of its employees or its agents becomes the subject of any criminal or disciplinary finding for which a person or entity can be debarred, excluded or suspended, said will inform the other of such development immediately.

iii. Neither it nor any of its employees or agents, to the knowledge of such party, have engaged in any activities which are prohibited, or are would be cause for civil penalties or mandatory or permissive exclusion from Medicare, Medicaid, or any other State Health Care Program or Federal Health Care Program (as those terms are defined in 42 C.F.R. § 1001.2) under 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b, or 1395nn, 18 U.S.C. § 1347, or 1035, or 31 U.S.C. § 3729-3733 (known as the Federal Civil False Claim Act), or the regulations promulgated pursuant to such statutes, including the submission of any claim in connection with any referrals that violate the Federal Physician Self-Referral ("Stark") law under 42 U.S.C. § 1395nn, including not having experienced any of the following: (i) a civil monetary penalty assessed against it under 42 U.S.C. § 1320a-7a or any applicable state Law; (ii) been excluded from participation under Medicare, Medicaid or any other State Health Care Program or Federal Health Care Program under 42 U.S.C. §§ 1320a-7 or 1320a-7a or any applicable Law or any third-party payor program; (iii) been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of the offenses described in 42 U.S.C. §§ 1320a-7(a) and (b)(1), (2), (3), or any applicable state Law that could lead to a mandatory or permissive exclusion from any State Health Care Program or Federal Health Care Programs; (iv) been suspended, debarred, or excluded from any federal program under 45 C.F.R. Part 76 or from any state program under any similar applicable state Law; or (v) been subject to any action under the Federal Civil False Claim Act, 42 U.S.C. § 1320a-7b, or any applicable state false claim or fraud Law.

iv. Neither it nor any of its employees or agents have received from any individual, nor from the U.S. Department of Health and Human Services or any other federal, state, or local government department or agency, any complaint, notice or other notification of a complaint, regarding its compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") or any other law or regulation applicable to health information.

v. Neither it nor any of its employees or agents have submitted any claim to any government program in connection with any referrals that violated the Federal Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn, and the regulations promulgated thereunder.

vi. Neither it nor any of its employees or agents have knowingly or willfully solicited, received, paid or offered to pay any illegal remuneration, directly or indirectly, overtly or covertly, in cash or in kind, for any referral in violation of any Law, including the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320(a)-7b(b), and the regulations promulgated thereunder (commonly known as the "Anti-Kickback Statute"), or any applicable state anti-kickback Law.

vii. Neither it nor any of its employees or agents have submitted any claims or aided in the submission of any claims to Medicare seeking reimbursement for services for which it knows that another health care provider, entity, or person also has submitted a claim seeking reimbursement.

viii. Neither it nor any of its employees or agents have submitted any claims or aided in the submission of any claims for payment to any payor source, either governmental or non-governmental, in violation of the Federal Civil False Claims Act, 42 U.S.C. § 1320a-7b, or any applicable state false claim or fraud Law.

      (a)    This Agreement shall be construed in a manner consistent with any and all applicable federal and state laws, including, without limitation, Medicare, Medicaid, the Health Insurance Portability and

Accountability Act of 1996 ("HIPAA") and other federal and state statutes and regulations and the principles and interpretations related thereto. The parties intend to comply with the provisions of 42 U.S.C. 1395nn(a)(1) and 42 U.S.C. 1320a-7b(b), as such provisions may be amended from time to time. The parties intend that this Agreement meet the requirements of the Safe Harbors allowed under the Federal Anti-Kickback statute, including the personal services and management Safe Harbor set forth in 42 C.F.R. part 1001.952(d).

(b)      The parties represent that, as of the date this Agreement is executed, the fee negotiated and agreed upon is fair market value for services rendered based upon arm's length bargaining and is consistent with the value of similar services. Furthermore, the parties represent that the fee is not, and has not been, determined in a manner that takes into account the volume or value of any referrals or business otherwise generated for or between the parties for which payment may be made, in whole or in part, under Medicare or any other federal health care program.

(c)      In the event there is a change in the federal or state statutes, case law or regulations, or the interpretation of the foregoing, which in the opinion of legal counsel of either party are reasonably likely to make this Agreement unlawful, the parties shall enter into good faith negotiations to revise this Agreement or enter into a new agreement which is in compliance with such laws and most closely approximates the economic benefits to the parties prior to such revision or new agreement. If such negotiations cannot resolve the matter, either party may terminate the Agreement by written notice to the other, allowing for a reasonable transition period.

**Section 6.02**      <u>Entire Agreement of the Parties</u>. This Agreement constitutes the entire agreement between PROVIDER and CONTRACTOR, supersedes all previous oral and written arrangements between the parties, and is intended as a complete and exclusive statement of the terms of their understanding. No waiver, modification, or amendment of any provision of this Agreement will be effective unless specifically made in writing and signed by the party to be bound thereby. No waiver of any term or condition of this Agreement will constitute a waiver of the same term or condition of this Agreement on any future occasion.

**Section 6.03**      <u>Severability</u>. If any term, condition or provision of this Agreement or the application thereof to any party or circumstance shall at any time or to any extent be invalid or unenforceable, then the remainder of this Agreement, or the application of such term, condition or provision to parties or circumstances other than those which it is held invalid or unenforceable, shall not be affected thereby, and each term, condition and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**Section 6.04**.      <u>Counterparts</u>. This Agreement may be executed in two or more counterparts. all of which will be considered the same document.

**Section 6.05**      <u>Governing Law</u>. This Agreement shall be construed in accordance with the laws of the State of Arizona, without regard to the conflict of law principles of any jurisdiction.

**Signature Page Follows.**

By the signatures of their duly authorized officers hereto affixed, the parties make this Agreement subject to the provisions set forth above.

**PROVIDER**

Dr. Gregory Ellison
Advanced Medical Center

**CONTRACTOR**

Paradigm Laboratories, LLC
By: Paradigm Companies, LLC, Owner

By: Dr. Gregory Ellison, Owner

Its:  Owner

Date:  3/17/16

By: Ethan Sasz
Its:  Member
Date:

6

# EXHIBIT C



**PacTox**
PACIFIC
TOXICOLOGY
LABORATORIES

9348  De Soto Avenue Chatsworth, CA 91311● Phone: 800-328-6942 ● FAX: 818-598-3116

**Request for Qualitative/Quantitative Custom Group.**  As part of my medical practice's pain management compliance protocols, I hereby request and authorize Pacific Toxicology Laboratories to establish the customized toxicology testing group ("Qualitative/Quantitative Group") to screen/quantify patient specimens from my practice for each of the prescription drug classes and illicit substance analytes that I have selected from the list below:

The Qualitative/Quantitative Group I have requested PacTox to make available for my use with my patients are as follows:

**Qualitative/Quantitative Group**– *Includes:*

### TESTS NOT AVAILABLE AT POC

| Drug Name | Qualitative Test | Quantitative Test |
|---|---|---|
| Acetaminophen | ☐ | ☐ |
| Carisoprodol | ☐ | ☑ |
| Cathinones | ☐ | ☐ |
| EDDP | ☐ | ☐ |
| EtG/EtS | ☐ | ☐ |
| Fentanyl | ☐ | ☐ |
| Gabapentin | ☐ | ☐ |
| Ketamine | ☐ | ☐ |
| Meperidine | ☐ | ☐ |
| Methylphenidate | ☐ | ☐ |
| Nicotine | ☐ | ☐ |
| NSAIDs | ☐ | ☐ |
| Pentazocine | ☐ | ☐ |
| Pregabalin | ☐ | ☐ |
| Propoxyphene | ☐ | ☐ |
| SSRIs | ☐ | ☐ |
| Tapentadol | ☐ | ☐ |
| Tramadol | ☐ | ☐ |
| Trazodone | ☐ | ☐ |
| Zolpidem | ☐ | ☐ |
| Synthetic Cannabinoids | ☐ | ☐ |

### TESTS  AVAILABLE AT POC

| Drug Name | Qualitative Test | Quantitative Test |
|---|---|---|
| Alcohol | ☐ | ☐ |
| Amphetamine | ☑ | ☐ |
| Barbiturates | ☑ | ☐ |
| Benzodiazepines | ☑ | ☐ |
| Buprenorphine | ☑ | ☐ |
| Cocaine | ☑ | ☐ |
| Heroin | ☐ | ☐ |
| Marijuana | ☑ | ☐ |
| MDMA | ☑ | ☐ |
| Methadone | ☑ | ☐ |
| Methamphetamine | ☑ | ☐ |
| Opiates | ☑ | ☐ |
| Oxycodone | ☑ | ☐ |
| Phencyclidine | ☐ | ☐ |
| TCA | ☐ | ☐ |

I understand that each Qualitative/Quantitative Group that I order will be billed by PacTox as shown below —I have reviewed the Medicare Fee Schedule (below) for each individual test component I have selected for this Pac-Pain Group:

| Test Name | 2014 CPT Codes* | 2015 CMS CPT Codes* | 2015 AMA CPT Codes* | 2015 CMS Fee Schedule | Third Party Bill Amount |
|---|---|---|---|---|---|
| High Complexity (Multiple Drug class) | G0431 | G0431 | 80304 | $  98.96 | $  123.70 |
| Moderate Complexity (Multiple Drug class) | G0434 | G0434 | 80301 | $  19.79 | $  24.74 |
| Urine Creatinine | 82570 | 82570 | 82570 | $  7.04 | $  8.80 |
| Nitrites | 84311 | 84311 | 84311 | $  9.52 | $  11.90 |
| PH | 83986 | 83986 | 83986 | $  4.87 | $  6.09 |

Initials _____

Page 1 of 4

**PACIFIC TOXICOLOGY LABORATORIES PacTox**

9348 De Soto Avenue Chatsworth, CA 91311• Phone: 800-328-6942 • FAX: 818-598-3116

As preparation for the Qualitative/Quantitative Group to be performed by PacTox, I will perform collection of urine specimen for each patient at my office and submit to PacTox.

<u>Request for Reflex to Quantitative Drug Testing.</u> For <u>each</u> **positive** drug identified by a Qualitative Group performed at my request, I hereby request PacTox to also perform quantitative testing of that drug *and* for the drug's bioactive metabolites. I have determined that <u>quantitative</u> testing of each class, plus the biologically active metabolites, of the medication I have <u>prescribed</u> for my pain management patients is medically necessary to confirm patient compliance with their pain management therapy at the levels I have prescribed. I have also determined that quantitation of the levels of any <u>non-prescribed</u> or illicit drugs present in the urine is medically necessary for me to evaluate the effect of those illicit drugs on my medical management.  I also understand and agree that reflex quantitation testing I have hereby requested will result in additional charges.  To assess the costs of testing my patients with the Qualitative/Quantitative Group and reflex to quantitative drug testing that I have hereby directed, I have carefully reviewed the CMS/Medicare fee schedule for both the Qualitative Group (above) and the quantitative testing costs (itemized on the attachment). Based upon my review of that fee schedule information, and my determination of medical necessity of the requested testing, I hereby direct that PacTox perform such testing in accordance with this Request and Acknowledgement.

I further acknowledge and understand the following:

1.  I understand that I have the choice to order any or all PacTox drug tests <u>individually</u> at any time, without ordering a customized panel.

2.  I agree to order this Qualitative/Quantitative Group only when I have determined that each individual test component of the panel is medically necessary for a specific patient, as documented in the patient's chart.

3.  I agree to provide diagnosis codes, defined to the highest level of specificity, for each test that I order in order to confirm medical necessity and to enable PacTox to bill effectively on my patient's behalf.

4.  I may only order those tests that I believe to be medically necessary for each individual patient to monitor their pain management therapy.

5.  I further understand that according to Medicare, "Confirmation of drug screens is indicated when the result of the drug screen is different than that suggested by the patient's medical history, clinical presentation or patient's own statement."

6.  I also understand that the Office of Inspector General (OIG) has cautioned:

    "[U]sing a customized profile may result in the ordering of tests which are not covered, reasonable or necessary."

    "OIG takes the position that an individual who knowingly causes a false claim to be submitted may be subject to sanctions or remedies available under civil, criminal and administrative law."

7.  I agree to obtain and submit to PacTox a valid Advance Beneficiary Notice (ABN) signed by the Medicare beneficiary for any test that is not supported by a diagnosis that meets Medicare's limited coverage/medical necessity requirements.

8.  I am aware that the laboratory has available a technical director to assist me, if I request, to ensure that appropriate tests are ordered.

9.  In cases of multiple physicians within a group practice, by signing my name below, I represent all physicians.

_____        3/15/15
Provider's Signature                     Date

                                         Initials



PACIFIC TOXICOLOGY LABORATORIES **PacTox**

9348  De Soto Avenue Chatsworth, CA 91311● Phone: 800-328-6942 ● FAX: 818-598-3116

### PACTOX DRUG QUANTIFICATION CODES & CHARGES

| Test Name | 2014 CPT Codes* | 2015 CMS CPT Codes* | 2015 AMA CPT Codes* | 2015 CMS Fee Schedule | Third Party Bill Amount |
|---|---|---|---|---|---|
| Acetaminophen (a) | 82003 | G6039 | 80329 | $ 27.54 | $34.43 |
| Alcohol | 82055 | G6040 | 80320 | $ 14.70 | $18.38 |
| Amphetamine/Methamphetamine | 82145 | G6042 | 80324 | $ 21.15 | $26.44 |
| Barbiturates | | | 80345 | | |
| Amobarbital- Butabarbital- Butalbital-Secobarbital-Pentobarbital | 82205 | G6043 | | $ 15.58 | $19.48 |
| Phenobarbital | 80184 | 80184 | | $ 15.58 | $19.48 |
| Benzodiazepines | 80154 | G6031 | 80346 | $ 25.17 | $31.46 |
| Buprenorphine | 83925 | G6056 | 80348 | $ 26.48 | $33.10 |
| Cannabinoids (THC) | 82542 | 82542 | 80349 | $ 24.58 | $30.73 |
| Cathinones (Bath salts) | 83789 | 83789 | 80371 | $ 24.58 | $30.73 |
| Carisoprodol | 83805 | G6052 | 80369 | $ 23.98 | $29.98 |
| Cocaine | 82520 | G6044 | 80353 | $ 20.62 | $25.78 |
| Ethyl Glucuronide – Ethyl Sulfate | 83789 | 83789 | 80321 | $ 24.58 | $30.73 |
| Fentanyl | 83925 | G6056 | 80354 | $ 26.48 | $33.10 |
| Gabapentin | 83789 | 83789 | 80355 | $ 24.58 | $30.73 |
| Heroin (6MAM) | 83925 | G6056 | 80356 | $ 26.48 | $33.10 |
| Ketamine | 83925 | G6056 | 80357 | $ 26.48 | $33.10 |
| MDMA (Ecstasy) | 82542 | 82542 | 80359 | $ 24.58 | $30.73 |
| Meperidine | 83925 | G6056 | 80362 | $ 26.48 | $33.10 |
| Methadone | 83840 | G6053 | 80358 | $ 22.22 | $27.78 |
| Methylphenidate | 83789 | 83789 | 80360 | $ 24.58 | $30.73 |
| NSAIDs     (a) | | | 80331 | | |
| Meloxicam-Diclofenac-Naproxen Nabumetone-Celecoxib-Ibuprofen | 83789 | 83789 | | $ 24.58 | $30.73 |
| Salicylic acid | 80196 | G6038 | | $ 9.66 | $12.08 |
| Opiates (Codeine/Morphine/Norhydrocodone/Hydrocodone/Hydromorphone) | | | 80361 | | |
| Codeine/Morphine/Norhydrocodone Oxycodone/Oxymorphone | 83925 - | G6056 - | - 80365 | $ 26.48 | $33.10 |
| Hydrocodone | 82646 | G6045 | - | $ 28.10 | $35.13 |
| Hydromorphone | 82649 | G6046 | - | $ 34.98 | $43.72 |
| Oxycodone | 83925 | G6056 | 80365 | $ 26.48 | $43.73 |
| Pentazocine | 83789 | 83789 | 80362 | $ 24.58 | $33.10 |
| Phencyclidine | 83992 | 83992 | 83992 | $ 18.99 | $30.73 |
| Phenothiazines | 84022 | G6057 | 80342 | $ 21.19 | $23.74 |
| Pregabalin | 83789 | 83789 | 80366 | $ 24.58 | $26.49 |
| Propoxyphene | 83925 | G6056 | 80367 | $ 26.48 | $30.73 |
| Synthetic Cannabinoids (K2 Spice) | 83789 | 83789 | 80351 | $ 24.58 | $33.10 |
| Tapentadol | 83925 | G6056 | 80372 | $ 26.48 | $30.73 |

Initials _____

1/1/2015



| Tramadol | 83925 | G6056 | 80373 | $ 26.48 | $33.10 |
|---|---|---|---|---|---|
| **Test Name** | **2014 CPT Codes*** | **2015 CMS CPT Codes*** | **2015 AMA CPT Codes*** | **2015 CMS Fee Schedule** | **Third Party Bill Amount** |
| Tricyclic Antidepressants | | | 80336 | | |
| Amitriptyline | 80152 | G6030 | | $ 24.36 | $30.45 |
| Nortriptyline | 80182 | G6037 | | $ 18.44 | $23.05 |
| Doxepin | 80166 | G6034 | | $ 21.09 | $26.36 |
| Desipramine | 80160 | G6032 | | $ 23.42 | $29.28 |
| Imipramine | 80174 | G6036 | | $ 23.42 | $29.28 |
| Zolpidem | 83789 | 83789 | 80368 | $ 24.58 | $30.73 |

a) Acetaminophen and NSAIDS Quantitative tests together billed as a single unit with CPT code 80331.

*Pacific Toxicology Laboratories bills Medicare using 2015 CMS CPT Codes and Health Insurance Companies using 2014 CPT Codes or 2015 AMA CPT Codes as appropriate.

Initials

# EXHIBIT D

**Physician Account Set-up**    (All Fields in Red are Required)

Sales Group: _____

Sign-up Date: 6/20/2014 ____ State: AZ _____

Type of Prescription Pad Requested: ( Custom )    Generic

Healthcare Provider's Information

If Supervised By Dr , Drs Name: _____

First Name: Gregory _____ Last Name: Ellison _____

Practice Name: Advanced Medical Center

Specialty:  ( MD /DO / DPM / PA / NP (Circle) EIN# 86-0767101

DEA # AE9679056 _____ NPI # 1669567434

Email Id: ellison _____ Password topical

Medical License # , State:  AZ 12426

Address Line 1: 2127 E. Baseline Rd. #104

Address Line 2: _____

City: Tempe _____ State: AZ _____ Zip: 85283

Office Phone : 480-897-7070 _____ Cell: 480-266-1441

Fax: 480-897-2597

Contact Person's Name: Julie Woodburn

**Is Physician Office Enrolled Under Either Program:**

Clinical Care Coordinator

## CLINICAL CARE COORDINATOR AGREEMENT

**THIS CLINICAL CARE COORDINATOR AGREEMENT** (the "**Agreement**") is made and entered into as of _June 20_, 20_14_ (the "**Effective Date**") by and between **Clincare, LLC**, a Florida limited liability company d/b/a "**ClinicalCorp**" ("**ClinicalCorp**"), and _Gregory L ELLISON IVW_ [print name and professional designation], an individual duly licensed to practice allopathic/osteopathic [circle appropriate designation] medicine in the State of _ARIZNA_ [print state of licensure] ("**Clinical Care Coordinator**" or "**CCC**").

### R E C I T A L S :

**WHEREAS**, ClinicalCorp operates a business engaged, among other things, in licensing and sublicensing software (the "**Software**") used to manage and report treatments for various health care services and disease states, and, in connection with its licensing of various modules of the Software, ClinicalCorp has agreed to assist its licensor to obtain data that can be used by the licensor to debug and improve the Software; and

**WHEREAS**, CCC operates a private practice in which CCC renders professional services to patients, and CCC is qualified by education, training and experience to personally monitor CCC's patient responses to surveys and provide feedback that can benefit ClinicalCorp and its licensor by helping to identify potential errors in reporting, thus facilitating updates and enhancements of the Software; and

**WHEREAS**, ClinicalCorp desires to engage the services of CCC to serve as one of its nationwide contracted clinical care coordinators to assist in improving the quality of the Software licensed by ClinicalCorp by providing the services outlined in Exhibit B, and CCC has agreed to be so engaged, pursuant to the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing recitals, which are hereby incorporated as an integral part of this Agreement, the mutual promises made herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### 1.   CCC SCREENING PROCESS; EFFECTIVE DATE OF THE AGREEMENT

CCC hereby acknowledges that, prior to the advent of this Agreement, CCC will comply with ClinicalCorp's screening process, which process includes the following steps:

(a)     completion and delivery of this Agreement signed by CCC, including the information requested on Exhibit D of this Agreement;

(b)     Completion of an interview by ClinicalCorp's Medical Director or designated Medical Liaison; and

(c)     completion of a fifteen (15) minute Program Orientation telephone call (the "**Orientation Call**") with ClinicalCorp's Medical Director or designated Medical Liaison and/or a member of ClinicalCorp's Medical Advisory Board (a.k.a., ClinicalCorp's "Medical Staff").

This process takes approximately fifteen (15) business days to complete from the date of delivery of the signed Agreement, and the Agreement will not be considered effective until the process is completed and the Agreement is signed by ClinicalCorp (at which time, the Effective Date in the opening paragraph will be filled in and a fully executed copy of this Agreement delivered to CCC). The purpose of the Orientation Call is to ensure the proper and timely collection of data. Failure to participate in the Orientation Call will result in CCC being terminated from the data collection program.

### 2.   RESPONSIBILITIES OF CCC

Once the Agreement becomes effective, CCC agrees to provide the services outlined in Exhibit B of this Agreement, which services will include distribution of the Patient Survey, in the form set forth in the appropriate Attachment to Exhibit A of this Agreement, or as subsequently revised by ClinicalCorp, to CCC's new and existing patients on the next scheduled visit of each patient in CCC's private practice; provided, that only one Patient Survey in the form of any Attachment to Exhibit A will be completed by a patient. The goal of this clinical care coordination process is to make inferences by comparing a Population Sample (compiled by ClinicalCorp or its affiliates from Private Practices) with the Control Sample (CCC's Private Practice) and Experimental Sample (CCC's Patients Scheduled on a given day) to identify potential errors in the applicable module of the Software. Prior to the collection of Patient Surveys, CCC must complete each step specified in Section 1, including participation in the Orientation Call. The information provided on CCC's Activity Logs, in the form set forth on Exhibit C of this Agreement, will not include any information relating to the direct clinical management of patients, and ClinicalCorp will use this information solely to gain insight into cause-and-effect, as described in the appropriate Attachment to Exhibit A of this Agreement.

### 3.   RELATIONSHIP OF THE PARTIES

It is understood that CCC is acting as an Independent Contractor of ClinicalCorp. It is agreed and acknowledged by the parties that, as an Independent Contractor, CCC retains the right to engage in the private practice of medicine, and nothing in this Agreement will be interpreted as limiting or restricting that right in any way. In no event will this Agreement be construed as establishing a partnership or joint venture or similar relationship between the parties, and nothing herein contained will be construed to authorize either party to act as agent for the other. This agreement in no way prevents or limits CCC from doing business with any other provider or vendor of CCC's own choosing except where explicitly prohibited due to

non-compete, non-circumvent or confidentiality. Nothing in this agreement should be used or construed as a way to direct patient care, patient prescriptions, patient referrals or other services between CCC and ClinicalCorp or its affiliates.

4.     **COMPENSATION**

(a)     It is estimated that the total time necessary for CCC to distribute, collect and review each Patient Survey, and then to compile the CCC Activity Log with pertinent information collected from the bottom portion of the Patient Surveys, entitled "For Physician Office Use Only: (Patients Please Do Not Enter Any Information Below)," and upload the information to ClinicalCorp's portal, will be approximately fifteen (15) minutes, and it is further estimated that the time required to perform CCC's duties under this Agreement will be approximately twenty (20) hours during the initial three (3) month probationary period, and forty (40) hours during the remaining term of this Agreement. Although the actual time may vary, compensation payable to CCC will be calculated based upon these estimates. CCC will be paid at a rate of $200 per hour (or $50 per Patient Survey, based upon the fifteen-minute estimate), up to a maximum monthly compensation in the amount of: (1) $4,000.00 per month for the initial three (3) month probationary period, or (ii) $8,000 per month for each subsequent month that CCC participates under this Agreement. The total actual compensation payable during a given month will be based upon the actual number of Patient Surveys uploaded to ClinicalCorp's portal during the given month (up to a maximum of 80 Patient Surveys per month during the initial three-month probationary period and 160 Patient Surveys in a given month thereafter). For example, if seventy (70) Patient Surveys are uploaded in a given month, then CCC will be paid compensation for that month of $3,500 [$50 x 70], if only forty (40) Patient Surveys are submitted in a given month, then CCC will be paid compensation for that month of $2,000 [$50 x 40], and if one hundred twenty (120) Patient Surveys are submitted in a given month after the initial probationary period, then CCC will be paid compensation for that month of $6,000 [$50 x 120].

(b)     Commencing with the initial calendar month during which occurs the Effective Date, and for each subsequent month that CCC participates under this Agreement, all of the actual compensation payable during a given month will be paid no later than the 15th day of the month following submission of the required CCC Activity Log for the previous month, as long as CCC has met the screening, Orientation Call and job duty requirements set forth in Sections 1 and 2 and in Exhibit B of this Agreement.

(c)     Payments will be made, in the discretion of CCC, either to CCC, in which case ClinicalCorp will report the payments under CCC's individual Social Security Number for tax purposes, or to the physician group that employs or is owned or controlled by CCC, in which case tax reporting will be done under the physician group's tax identification number. CCC will designate the choice made hereunder on the signature page of this Agreement, which designation may be changed prospectively in the discretion of CCC by giving notice to ClinicalCorp in accordance with the notice provision of this Agreement.

(d)     Notwithstanding the foregoing, no compensation will be paid to CCC for any month in which CCC: (i) does not submit a timely-completed CCC Activity Log, in substantially the format set forth in Exhibit C of this Agreement or (ii) fails to remain actively involved by participating in physician webinars on the Software. Both parties hereby acknowledge that any scheme of "pay-per-script", "pay-per-referral" or direction of patient care is strictly prohibited and forbidden and shall not constitute any part of this Agreement, nor will there exist any tie between the volume of referrals to and from any pharmacy relating to prescriptions or any other services being accessed through the Software.

5.     **PAID PROBATIONARY PERIOD**
         This Agreement is subject to a three (3) month paid probationary period. The Effective Date shall occur on the date specified in Section 1 above. It is understood that the Orientation Call and paid probationary period are designed to determine CCC's suitability by assessing CCC's interest, skills, performance and interpersonal relationships. It also affords CCC time to assess ClinicalCorp's performance under this Agreement. This Agreement may be terminated by either party at any time during this paid three-month probationary period immediately upon giving written notice of termination. In the event of termination by either party during this paid three-month probationary period, compensation will be paid only through the date of actual termination. Thereafter, the parties will not enter into a contract for any type of services during the balance of the one (1) year period that commenced on the Effective Date.

6.     **TERM**
         Subject to Section 1, this Agreement shall become effective as of the Effective Date, and the term hereof shall conclude at 12:00 AM EDT on the first anniversary of the Effective Date, unless termination occurs earlier pursuant to Section 5. Thereafter, the term shall renew automatically for additional terms of one (1) year each, each such renewal term commencing on the anniversary of the Effective Date, unless termination occurs earlier pursuant to Section 5.

7.     **TERMINATION**

(a)     Termination for Breach. Either party may terminate this Agreement upon breach by the other party of any material provision of this Agreement; provided such breach remains uncured for fifteen (15) continuous days after receipt by the breaching party of written notice of such breach from the non-breaching party.

(b)     Immediate Termination. This Agreement may be terminated by ClinicalCorp immediately, by written notice to CCC, upon the occurrence of any of the following events:

• upon the denial, suspension, revocation, termination, restriction, lapse, or voluntary relinquishment of CCC's license to practice medicine;

• upon the death or permanent disability of CCC;

• upon the termination, revocation, restriction, or relinquishment of CCC's DEA and/or similar State drug registration;

• if the conduct of CCC, in the sole reasonable discretion of ClinicalCorp, is deemed to no longer be in the best interest and welfare of ClinicalCorp;

• upon a breach of the confidentiality provisions in this Agreement;

• upon CCC's conviction or plea of guilty or nolo contendre to a felony or to an offense related to healthcare, or a listing by a federal agency of CCC as being debarred, excluded, or otherwise ineligible for federal program participation; or

• upon CCC becoming insolvent, making assignment for the benefit of creditors, being declared in bankruptcy or having CCC's assets administered in any type of creditor's proceeding.

(c)      Change in Law. If there is a change in a federal or applicable State statute or regulation, or an interpretation of the law by a court of competent jurisdiction that would render the arrangement specified in this Agreement illegal, then and in that event, either party may request in writing that the Agreement be amended to comply with the change in the law, if possible, and the parties agree to negotiate in good faith the necessary changes, attempting to maintain the contemplated financial relationship described herein to the extent possible. If the parties are unable to reach an agreement within thirty (30) days after receipt by the other party of the requesting party's request to amend, then this Agreement will terminate without further action upon the lapse of such thirty-day period.;

(d)      Termination Without Cause. Either party may, without cause and upon ten (10) days' prior written notice, terminate this Agreement; provided, however, that if CCC presents such a notice of termination, then ClinicalCorp may immediately suspend CCC's participation and pay CCC the monthly compensation earned prior to the notice of termination in lieu of CCC continuing to participate. If a party terminates during the initial one-year term, then the parties will not enter into a contract for any type of services during the balance of the one (1) year period that commenced on the Effective Date.

(e)      Restrictive Covenants. CCC agrees that the information learned from ClinicalCorp prior to and during the term of this Agreement would cause irreparable harm to ClinicalCorp, its licensor and their affiliates and allow ClinicalCorp's competitors an unfair advantage over ClinicalCorp. Accordingly, CCC agrees, during the term of this Agreement and for a period of one (1) year after the termination of this Agreement:

• not to contract, directly or indirectly, with ClinicalCorp's competitors, or companies offering similar agreements for the same or similar services. and

• directly or indirectly, not to solicit any ClinicalCorp employee or contractor to terminate his or her employment or contract with ClinicalCorp or to offer employment to any ClinicalCorp employee or contractor (for this purpose, an "employee or contractor" shall include any individual who is employed or contracted at that time by ClinicalCorp or was employed by or contracted with ClinicalCorp at any time within the prior six (6) months).

## 8.      CONFIDENTIALITY

(a)      ClinicalCorp's Information. CCC recognizes and acknowledges that, by virtue of entering into this Agreement and providing services to ClinicalCorp hereunder, CCC will have access to certain information of ClinicalCorp and its licensor that is confidential and constitutes valuable, special and unique property of ClinicalCorp and its licensor. Accordingly, CCC will not at any time, either during or subsequent to the termination of this Agreement, disclose to others, or use, copy or permit to be copied without ClinicalCorp's express prior written consent, except pursuant to CCC's duties hereunder, any confidential or proprietary information of ClinicalCorp or its licensor, including but not limited to, information that concerns ClinicalCorp's and its licensor, the Software, clients, costs, prices and methods at any time used, developed, or made by ClinicalCorp or its licensor and that is not otherwise available to the public.

(b)      CCC's Information. ClinicalCorp recognizes and acknowledges that, by virtue of entering into this Agreement, ClinicalCorp may have access to certain information of CCC that is confidential and constitutes valuable, special and unique property of CCC. Accordingly, ClinicalCorp will not at any time, either during or subsequent to the termination of this Agreement, disclose to others, or use, copy or permit to be copied without CCC's express prior written consent, except pursuant to ClinicalCorp duties hereunder, any confidential or proprietary information of CCC including, but not limited to, information that concerns CCC practice, equipment, personnel, payor relationships, costs, prices and methods at any time used, developed, or made by CCC and that is not otherwise available to the public.

(c)      Terms of this Agreement. Except for disclosure to CCC's legal counsel, accountant, or other advisors, CCC will not disclose the terms of this Agreement to any third party, unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to by ClinicalCorp. Unauthorized disclosure of the terms of this Agreement will be a material breach of this Agreement and will provide ClinicalCorp with the option of pursuing remedies for breach or immediate termination of this Agreement in accordance with this Agreement.

(d)      HIPAA and State Confidentiality Compliance. Each party will comply with the applicable provisions of the

Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. § 1320d through d-8 ("**HIPAA**"), as the same may be amended from time to time, and the requirements of any regulations promulgated thereunder including, without limitation, the federal privacy regulations as contained in 45 CPR Part 164 (the "**Federal Privacy Regulations**") and the federal security standards as contained in 45 CPR Part 142 (the "**Federal Security Regulations**"). Neither party will use or further disclose any protected health information or individually identifiable health information, as defined in HIPAA and the Federal privacy Regulations (collectively, the "**Protected Health Information**"), concerning a patient of CCC, other than as permitted by the requirements of HIPAA or the Federal Privacy Regulations and the Federal Security Regulations. Each party will implement appropriate safeguards to prevent the use or disclosure of a patient's Protected Health Information. ClinicalCorp will promptly report to CCC any use or disclosure of a patient's Protected Health Information of which it becomes aware that is in violation of HIPAA, the Federal Privacy Regulations, the Federal Security Regulations, and State confidentiality laws applicable to CCC. In the event ClinicalCorp, with CCC's approval, contracts with any agents to whom ClinicalCorp provides a patient's Protected Health Information, ClinicalCorp, will include provisions in such agreements whereby ClinicalCorp, and its agent agree to the same restrictions and conditions that apply to CCC with respect to such patient's Protected Health Information. ClinicalCorp, will make its internal practices, books, and records relating to the use and disclosure of a patient's Protected Health Information available to the Secretary of Health and Human Services to the extent required for determining compliance with the Federal Privacy Regulations and the Federal Security Regulations. In addition, with respect to any of CCC's patients receiving treatment for alcohol or drug abuse, ClinicalCorp is fully bound by the provisions of the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records (42 C.F.R. Part 2, as amended from time to time). Notwithstanding the foregoing, no attorney-client, accountant-client, or other legal privilege will be deemed waived by CCC or ClinicalCorp by virtue of this agreement.

9.   **REQUIRED DISCLOSURES**

   (a)   CCC will notify ClinicalCorp in writing within three (3) days after any of the following events occur:

   •   CCC's license to practice medicine lapses or is denied, suspended, revoked, terminated, relinquished, or made subject to terms of probation or other restriction;

   •   CCC's medical staff privileges at any health care facility are denied, suspended, revoked, terminated, voluntarily relinquished or made subject to terms of probation or other restriction;

   •   CCC becomes the subject of an investigatory, disciplinary, or other proceeding or action before any governmental, professional, licensing board, medical staff, or peer review body;

   •   CCC's DEA or State drug registration is revoked, terminated, restricted, or relinquished, placed on terms of probation, or restricted in any way;

   •   CCC is convicted of a felony or an offense related to health care or CCC is listed by a federal or State agency as being debarred, excluded, or otherwise ineligible for federal or State program participation.

   (b)   ClinicalCorp will notify CCC in writing within three (3) days if ever one of the following events occurs:

   •   ClinicalCorp's licenses and certifications lapse or is denied, suspended, revoked, terminated, relinquished, or made subject to terms of probation or other restriction;

   (c)   CCC will keep and maintain (or cause to be kept and maintained) in a timely fashion accurate and appropriate records relating to all services rendered by CCC under this Agreement, including Patient Surveys, CCC's Activity Logs, and CCC will timely prepare and attend to, in connection with such services, all billing reports, quality assurance and utilization review reports, and correspondence necessary and appropriate under this Agreement;

10.   **NOTICES**
   All notices hereunder will be in writing, delivered personally, or delivered by certified or registered mail return receipt requested, or by overnight courier, and will be deemed to have been duly given when delivered (or upon refusal of delivery), addressed as follows:

**ClinicalCorp:**

Clincare LLC, d/b/a ClinicalCorp
50 Central Avenue
Suite 950
Sarasota, Florida  34236
Attn: Manager

**CCC:**

[Print CCC's Name] Gregory L ELLISON, MD

[Print CCC's Address] 2727 E BASELINE Rd #104

[Print CCC's City/State/Zip] TEMPE, Az, 85283

[Print CCC's Phone Number] 480 877 7070

[Print CCC's Fax Number] 480 877 2597

[Print CCC's Email Address] gregLELLISON @ msn.com

[Print CCC's NPI Number] 1669567434

[Print CCC's Medical License Number] A2 12426

-4-

*[Print CCC's DEA Number]* _____

11. **REFERRALS**
The parties acknowledge that none of the benefits granted CCC hereunder are conditioned on any requirement that CCC make referrals to, be in a position to make or influence referrals to, or otherwise generate business for ClinicalCorp or its affiliates. The parties further acknowledge that CCC is not restricted from referring any patient to, or otherwise generating any business for any other facility of CCC's choosing.

12. **GOVERNING LAW**
This Agreement will be construed in accordance with the laws of the State of Florida. Venue shall be in Sarasota County, Florida.

13. **EXHIBITS**
All Exhibits referenced herein and attached hereto, along with any revisions, deletions or additions thereto made by ClinicalCorp from time to time, are incorporated in and hereby made an integral part of this Agreement.

14. **ENTIRE AGREEMENT; MODIFICATION**
This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the Parties relating to such subject matter. This Agreement may not be amended or modified except by mutual written agreement.

15. **COUNTERPARTS; FAX SIGNATURES**
This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and same instrument. Faxed or other electronic signatures shall be deemed to be originals and effective to bind the party whose authorized representative signs below.

**IN WITNESS WHEREOF,** the parties have executed this Clinical Care Coordinator Agreement, consisting of five (5) pages, including this signature page but not including the Exhibits hereto, on the date first set forth above.

CCC:

Signature

Printed Name: Gregory L Ellison

Email Address: GregLEllison@MSN.com

ClinicalCorp:

Clincare LLC, d/b/a ClinicalCorp

By: _____
    Signature
Printed Name: _____
Title: _____

Email Address: _____

Name of Entity Receiving Compensation
(if different than CCC):

_____

Tax ID # for Reporting payments:

86-0767101

**Attachments:**

| | |
|---|---|
| Exhibit A | Description of Patient Survey Process, Form of Patient Survey and Related Information (each Survey will be described in a separate Attachment to Exhibit A) |
| Exhibit B | Description of CCC's Duties and Responsibilities |

Exhibit C        Form of CCC's Activity Log
Exhibit D        Program Qualifications and Contact Information

**EXHIBIT A**
**Attachment 1**

**Description of Patient Survey Process:**

The initial Patient Survey process will be used to assist in debugging and improving the quality of the module of the Software licensed by ClinicalCorp that involves compounded pharmaceuticals used to treat certain health problems that are described in the International Statistical Classification of Diseases and Related Health Problems (the "ICD"), a medical classification list published by the World Health Organization, which accounts for diseases, signs and symptoms, abnormal findings, complaints, social circumstances, and external causes of injury or diseases, which ICD currently is being transitioned from the ninth edition ("**ICD-9**") to the tenth edition ("**ICD-10**"), and subsequently is expected to be transitioned to later editions of the ICD.

The Patient Survey set forth on page 2 of this Attachment 1 will benefit ClinicalCorp and its licensor by helping to identify potential errors in reporting, thus facilitating updates and enhancements of the Software to assist in the transition to ICD-10 and later editions.

ClinicalCorp will use the information derived from the Patient Surveys solely to gain insight into cause-and-effect by reporting outcomes that occur when a particular factor, such as the reoccurring incidence of a particular ICD-10 code listed on page 3 of this Attachment 1, is manipulated within the Control Sample of CCC's private practice, which insights will be used for the sole purpose of updating or enhancing the Software.

**Exhibit A**
**Attachment 1**

**Form of Patient Survey**

Name:_____ _____   Age: _____

Phone:_____   Cell:_____   Email:_____

Insurance Type: Medicare/ Medicaid/ Commercial/ WC/ PI/ Cash (circle)

Ins Co Name: _____

**Check and/or Circle any of the following conditions you are currently experiencing:**

☐ Low Back Pain
☐ Neck Pain
☐ Headaches
☐ Joint Pain _____
Which Joint?
☐ Tendonitis
☐ Epicondylitis
☐ Fibromyalgia
☐ Post-Herpetic Neuralgia
☐ Plantar Fasciitis
☐ Post Laminectomy Pain

☐ Numbness/Tingling in Arm or Hand
☐ Numbness/Tingling in Legs or Feet (R/L)
☐ Pain in the Arm/Hand/Leg/Feet (R/L)
☐ Tense Muscles _____
Which Muscles?
☐ Bursitis
☐ Osteoarthritis
☐ Diabetic Neuropathy
☐ General Neuropathy
☐ Myofascial Pain/RSD/CRPS
☐ Chemo-Induced Neuropathy

**Please answer the following about the above conditions:**
Which of the above conditions is the worst? _____
On a scale of 1 to 10, how would you rate the pain? _____
[1 = minimal pain / 10 = severe pain]
How long have you been suffering with this condition? _____
How is this condition affecting your ability to perform daily tasks? _____
_____

Would you like to get rid of or reduce this problem?             ☐ Yes    ☐ No
Have you tried medications that have not helped?              ☐ Yes    ☐ No
If yes, what have you tried?          ☐ Oral ☐ Injectable      ☐ OTC    ☐ RX

I authorize the release of this Patient Survey for use in research and understand that I can revoke this granted permission at any time.

☐ If it were available, I would be interested in receiving a new and alternative non-addictive medication protocol.

_____
Patient Signature

For Physician Office Use Only: (Patients Please Do Not Enter Any Information Below)

Today's Date: _____   Male / Female   DOB: _____   ICD-10_____

**EXHIBIT A**
Attachment 1

Pertinent ICD-10 Classifications

2013 ICD-10-CM Diagnosis Code R52, T81.4, E11.21

Pain, unspecified, Infection following a procedure

- On October 1, 2014 ICD-10-CM will replace ICD-9-CM in the United States, therefore, R52, T81.4, E11.21 and all ICD-10-CM diagnosis codes should only be used for training or planning purposes until then. T81.4 is not a specific ICD-10-CM diagnosis code and cannot be used to indicate a medical diagnosis.

R52 Applicable To
- Acute pain NOS
- Generalized pain NOS
- Pain NOS

T81.4 Applicable To
- Intra-abdominal abscess following a procedure
- Post procedural infection, not elsewhere classified
- Sepsis following a procedure
- Stitch abscess following a procedure
- Subphrenic abscess following a procedure
- Wound abscess following a procedure

E11.21 Applicable To
- Type 2 diabetes mellitus with intercapillary glomerulosclerosis
- Type 2 diabetes mellitus with intracapillary glomerulonephrosis

Type 2 diabetes mellitus with Kimmelstiel-Wilson disease

EXHIBIT B

Description of CCC's Duties and Responsibilities

The parties acknowledge that, in order for information and insight regarding potential errors in reporting of ClinicalCorp's and its licensor's Software, practical experience and private practice, while not mandatory, are an advantage. Therefore, after being qualified for participation, CCC agrees to distribute the Patient Survey set forth in the appropriate Attachment to Exhibit A to new and existing patients on the next visit of each patient in CCC's private practice; provided, that only one Patient Survey in each Attachment to Exhibit A will be completed by a patient. The information contained on the bottom portion of the Patient Survey, entitled "For Physician Office Use Only: (Patients Please Do Not Enter Any Information Below)," shall be appended to CCC's Activity Log, which Activity Log will be delivered to ClinicalCorp by facsimile or email every Friday by 5:00 PM EDT.

1. CCC will keep and maintain (or cause to be kept and maintained) in a timely fashion accurate and appropriate records relating to all HIPAA related patient forms and will bear sole and full responsibility of HIPAA compliance as it relates to CCC's performance of duties under this Agreement;

2. CCC will keep and maintain (or cause to be kept and maintained) in a timely fashion accurate and appropriate records relating to all services rendered as CCC under this Agreement, including Patient Surveys, CCC's Activity Logs, and CCC will timely prepare and attend to, in connection with such services, all utilization review reports, and correspondence necessary and appropriate under this Agreement;

3. CCC will submit completed Activity Logs via Secure Physician Portal. ClinicalCorp will not pay or credit CCC for Activity Logs submitted after Friday 5:00 PM EDT for the week prior.

4. CCC's duties and obligations set forth in this Exhibit B, are subject to these overall guidelines.
   • 80% of CCC's time in fulfilling responsibilities hereunder is expected to be spent getting new and existing patients to complete Patient Surveys and reporting on the data collected thereby and other sampled data which go above and beyond the scope of CCC's existing patient care, as it pertains to CCC's overall patient population (the "Control Sample"), in states where it is deemed legal and compliant. This responsibility is accomplished by CCC entering the following fields on CCC's Activity Log for each patient on his or her next visit only: Date, Male/Female, Date of Birth, ICD-10 (from within Exhibit A, if applicable).
   • 20% of CCC's time in fulfilling responsibilities hereunder is expected to be spent participating in webinars for the purpose of educating other Physicians on the Software.

**EXHIBIT C**

**CCC Activity Log**

Practice Name:_____

Name:_____

Physician Address:_____

City, State, Zip Code:_____

Date_____

Male / Female    DOB: _____    ICD-10 (1):_____

Total Hours = _____

Invoice Amount = _____

* Each individual entry on CCC'S Activity Log is billable as 15 minutes, at a fixed rate of $200.00 per hour

I hereby certify to the best of my knowledge, information and belief that the information provided above is true and accurate.

_____
CCC SIGNATURE

Please complete and tally Total Hours and Invoice Amount for the previous week and append within your Secure Physician Portal to ClinicalCorp every Friday by 5:00 PM EDT.

*Exhibit C – Page 1*

**EXHIBIT D**

**Program Qualifications and Contact Information**

1. Physician Name:_____

2. Medical License State and Number:_____

3. Drug Enforcement Agency Number (DEA):_____

4. National Provider Index (NPI):_____

5. Name of Office Manager (Contact):_____

6. Phone Number and Extension for "Contact":_____

7. Email Address of "Contact":_____

8. Mailing Address:_____

9. Office Hours by Day:_____



# Trenam Kemker
### ATTORNEYS

Please reply to:
P.O. Box 1102
Tampa, FL 33601-1102
Direct Line (813) 227-7451
dbweinbren@trenam.com

May 3, 2014

*VIA E-MAIL*
*CONFIDENTIAL*

Clincare LLC
50 Central Avenue Suite 950
Sarasota, Florida  34236

Re:    Revised Clinical Care Coordinator Agreement

Gentlemen:

This letter responds to your request for an opinion on the legality of the revised Clinical Care Coordinator Agreement (the "Agreement"), pursuant to which Clincare LLC ("Clincare") will contract with and pay one or more unrelated physicians, each as an independent contractor, for each physician to obtain patient surveys (the "Surveys") from new and existing patients and to provide feedback that can be used to identify potential software reporting errors. This information will be used by the software licensor to determine the need or advisability for updates and enhancements of the licensed software.

## Background

Clincare currently exclusively licenses, and then sub-licenses to end-users, software that assists pharmacies and providers to manage and report their prescription and sale of compounded pharmaceuticals and related services for pain management. As partial consideration for the software license, Clincare agreed with the licensor to obtain data that can be used to identify issues and assist the licensor to debug and enhance its software. This software uses codes specified in the International Statistical Classification of Diseases and Related Health Problems (the "ICD"), a medical classification list published by the World Health Organization, which accounts for diseases, signs and symptoms, abnormal findings, complaints, social circumstances, and external causes of injury or diseases, which ICD currently is being transitioned from the ninth edition ("ICD-9") to the tenth edition ("ICD-10"), and subsequently is expected to be transitioned to later editions of the ICD. To fulfill its obligation to the licensor, Clincare is engaging physicians who are unrelated to Clincare to assist in the collection of the Surveys from their new and existing patients. The data collected from the Surveys then is de-identified by the physician before delivery to Clincare. Clincare will aggregate the data and use it to draw inferences that the licensor can use to assist in its transition of the software from ICD-9 to ICD-10 reporting (and again for transition to later versions of the ICD).

It is intended that, over time, Clincare will license, and sub-license, other modules of the

Hand Delivered:
101 E. Kennedy Blvd., Ste. 2700
Tampa, FL  33602
Tel (813) 223-7474
Fax (813) 229-6553

www.trenam.com

Hand Delivered:
200 Central Ave., Suite 1600
St. Petersburg, FL 33701
Tel   (727) 896-7171
Fax (727) 820-0835

Clincare LLC
May 3, 2014
Page 2

software that will be used in connection with other types of health care services (e.g., genetic testing) or specific disease states (e.g., diabetes). As other modules are placed into use by Clincare, similar data-gathering will be requested by the licensor to ensure the efficacy of the software and to assist in development of enhancements. Thus, Clincare anticipates that it will have an ongoing need to obtain Surveys from physicians, with the design of the Surveys being revised over time to address the information needs of the licensor as it relates to the additional software modules that it develops.

The physicians that Clincare engages to conduct the Surveys necessarily must be in a position to refer patients for the compounded pharmaceuticals or other services that are addressed by the software, because they otherwise would not have data relevant to efficacy of the applicable software. Because Clincare's affiliates also are involved in the referral string (as manager of provider and insurance networks), you want to make sure that Clincare's relationship with the physicians under the Agreement complies with applicable law.

### Relevant Law

We are licensed to practice law only in Florida, and thus we are competent to render an opinion only on federal and Florida law. In this regard, there are two primary laws that could impact on the Agreement, one federal law and one Florida law. Similar laws also may apply in other States, and we recommend a review of the applicable laws (or hire local counsel to do so) as your business expands into other States over time.

1.  ***The Medicare and Medicaid Anti-Kickback Statute (the "AKS") and Safe Harbor Regulations:*** The federal AKS prohibits anyone (not just physicians and entities that actually render health care services) from "knowingly and willingly" soliciting, receiving, offering, or paying any remuneration, directly or indirectly, in cash or in kind, in return for referrals, or to influence referrals, for services that may be paid by Medicare or Medicaid. A violation of the AKS is a felony, punishable by fines of up to $25,000 and up to five years in prison. In addition to the potential criminal sanctions, in certain cases the HHS Office of Inspector General (the "OIG") can exclude any physician, other provider or other person (e.g., marketing and management personnel) who violates the AKS from the Medicare or Medicaid Program for a period of five years (or longer in some cases). A violation of the AKS can also form the basis of an action under the federal False Claims Act, a civil liability statute that may be enforced either by the government or private whistleblowers on behalf of the government to recover claims wrongly paid by the government.

As a criminal law, the AKS requires the government to prove that a person intended to violate the law. However, in the leading case under this law (United States v. Greber), the court ruled that "if one purpose of the payment is to induce future referrals, the [M]edicare statute has been violated."

Because the law is so draconian, Congress mandated that the OIG, which has jurisdiction over the law, publish Safe Harbor Regulations. These regulations do not define whether acts are



Clincare LLC
May 3, 2014
Page 3

legal or criminal, but rather spell out certain situations (the "safe harbors") in which the government will not prosecute any party who meets the safe harbor standards. The safe harbor that applies to the Agreement is commonly called the "personal services" safe harbor, and it requires that any compliant contract meet all of the following standards:

- the agreement must be set out in writing and signed by the parties;
- the term of the agreement must be not less than one year;
- the aggregate services specified in the agreement must not exceed those that are necessary for the commercially reasonable business purpose of the agreement;
- the agreement must specifically identify and cover all of the services the agent provides to the principal for the term of the agreement;
- the aggregate compensation to be paid to the agent during the term of the agreement must be set in advance, be consistent with fair market value in arms-length transactions and not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties;
- if the agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis, then it must specify exactly the schedule of such intervals, their precise length, and the exact charge for such intervals; and
- the services to be furnished under the arrangement do not involve the counseling or promotion of a business arrangement or other activity that violates any federal or State law.

Failure to meet all of the standards of the applicable safe harbor does not mean that an arrangement, or the contract defining the arrangement, is *per se* illegal. Rather, it means that the arrangement could be subject to review by the OIG to determine whether it violates the AKS, based upon all of the facts and circumstances of the arrangement.

2. **_The Florida Patient Brokering Act (the "PBA")_:** The PBA is a Florida criminal statute that makes it unlawful for any person to

"[o]ffer or pay . . . [or] solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage from a health care provider or health care facility."

The referral at issue in the PBA is any referral of a patient by a health care provider, regardless of what entity the patient is referred to, if the provider received a direct *or indirect* payment from the recipient of the referral. Like the AKS, both the party paying the kickback and the person receiving the kickback are deemed to violate the PBA. However, unlike the AKS, although it is a criminal law, the PBA does not require the government to prove that a person intended to violate the law; the mere failure to comply is all that is needed to prove a violation. A violation constitutes a third-degree felony, carrying fines of up to $5,000 and



Clincare LLC
May 3, 2014
Page 4

imprisonment for up to five years, or both, for each violation. In addition, a physician who violates the PBA can face suspension or revocation of his or her medical license.

It is probable that any violation of the AKS also constitutes a violation of the PBA, because the same basic analysis applies. The PBA does contain several exceptions, however. Most notably, an exception exists for any arrangement that would not violate the AKS (e.g., an arrangement that fully meets all applicable safe harbors or otherwise does not implicate an intent to pay for referrals). Therefore, analysis of a proposed arrangement against the requirements of the AKS is instructive in interpreting compliance with the PBA, as well.

### *Analysis*

In any analysis of the AKS and PBA, the first question must be "where is the referral for which a payment is made or received"? With respect to the Agreement, the "referral" at issue would be the referral by a physician who is a party to the Agreement of his patients for the compounded pharmaceuticals and related services (or for other services, such as genetic testing) for which the software is used. While the payment is not made directly for this referral, both laws look at any payment, direct *or indirect*, that may induce a referral. As noted above, because the same analysis applies, analysis of the Agreement against the requirements of the AKS is instructive in interpreting compliance with the PBA, as well. Also while we understand that Clincare does not intend for the software to be used in connection with business that would be reimbursed under the Medicare or Medicaid programs, and while there currently is no talk about this, we do not yet know how or if the federal Affordable Care Act (a/k/a "ObamaCare"), under which commercial insurance is purchased through a "marketplace" that is regulated (and sometimes sponsored, as in Florida) by the federal government, may or will be used to expand the federal government's jurisdiction over health care that traditionally has been governed only under State laws. Thus, even if not directly applicable at the present time, the following analysis of the Agreement is conducted under the lens of the AKS and its "personal service" safe harbor, because compliance with the AKS will ensure compliance with the PBA.

Comparing the Agreement to the standards set forth above in the "personal services" safe harbor, we note the following.

- The Agreement is in writing and will be signed by the parties.
- The Agreement has a specified term of not less than one year.
- The Agreement appears to have a commercially reasonable business purpose, specifies the aggregate services, and, based upon our conversations, those services appear to not exceed those that are necessary to accomplish the business purpose of the Agreement.
- The Agreement specifically identifies the services that a physician will provide during the term of the Agreement, and we understand that those services constitute all of the services that the physician will render to Clincare.
- The aggregate compensation to be paid to the agent during the term of the Agreement is set in advance and, based upon our discussions, we understand that it is not



Clincare LLC
May 3, 2014
Page 5

- determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties.
- The Agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis. However, it is not possible under the circumstances to specify an exact time schedule, because the actual time spent will depend upon when the physician sees a patient, so the Agreement instead specifies the maximum length of time that the physician will spend (twenty or forty hours per month)) and the exact charge for each interval.
- The services to be furnished under the Agreement do not involve the counseling or promotion of an activity that violates any federal or State law.

To summarize, with one exception, the Agreement appears to meet the standards of the "personal services" safe harbor under the AKS, and thus also should be compliant with the PBA. The one exception is whether the specific sum to be paid for the physician's services will be consistent with fair market value. The OIG defines "fair market value" as:

> "the value in arm's length transactions, consistent with the general market value. 'General market value' means . . . the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party . . . at the time of the service agreement."

We are not competent to opine on whether a payment constitutes "fair market value," as that requires a market appraisal by a competent appraiser or accountant. There also are industry groups that may provide background on what other software developers pay outside contractors for similar services (e.g., de-bugging or error identification). The key is that the payment must be what the parties would agree upon in equal arm's-length negotiations. If the amount paid can be justified as fair market value through comparables or an opinion of an appraiser or accountant, then we believe that the Agreement is compliant with the law.

Finally, two other questions came up in our discussions that we believe should be briefly addressed. First, because the data from the Surveys that will be delivered by the physicians to Clincare will be de-identified, there should be no information disclosed to Clincare that constitutes "individually identifiable health information" regarding a patient. Thus, there is no violation of the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA").

Second, many states, including Florida, require a physician to disclose to a patient any ownership or other financial interest that the physician has in an entity to which the physician refers the patient for services. We do not believe that this notice requirement is implicated by the Agreement, because: (1) the physician does not hold an ownership interest of any kind in Clincare, and (2) the physician is not referring the patient to Clincare for any services. Rather, the physician is referring the patient to a pharmacy or other provider (e.g., laboratory) for the services. The pharmacy or laboratory likely sub-licenses the software from an affiliate of



Clincare LLC
May 3, 2014
Page 6

Clincare, but neither Clincare nor its affiliate is providing any services to the patient; rather, the affiliate, through its sub-license of the software, is providing services to the pharmacy or laboratory. Because of other federal and Florida laws that are beyond the scope of this opinion, the physician generally cannot have an ownership or financial interest in the pharmacy or laboratory to which he or she refers. Thus, we see no nexus for the notice requirement to apply with respect to the Agreement.

Please let us know if you have any other questions in this regard.

Sincerely,

Don B. Weinbren

DBW/lab





# FAX PRESCRIPTION TO : __954-507-4156__

## SPECIALTY COMPOUNDING REQUEST

The patient identified is requesting a doctor's authorization for the prescription indicated below. Please complete this form and fax it to **954-507-4156**. If you do not include the face sheet, it is imperative that the information under "Patient Information" be completely filled out. If you need assistance contact the office by calling **954-989-6524**.

**Patient Name:** _____   M / F   **DOB:** ___/___/___
Home PH #: _____ Cell PH #: _____
Address: _____
City: _____ State: _____ Zip: _____
Allergies: _____ **Insurance Carrier:** _____

**To Accompany This Script:**
Please Include Drug Benefit Card/Info: ID #, Group #, BIN #, Ins. Tel #, Ins. Fax #.
If Workers Comp, Include: Date of Injury, Claim #, Policy #, and Ins. Company Info.

---

☒ **FBCGL**

Flurbiprofen 20%

Baclofen 4%

Cyclobenzaprine 2%

Gabapentin 10%

Lidocaine 5%

Lipopen Ultra Cream

---

Qty: ☐ 360 gms   ☐ 240 gms 1 pump = 1 gm

SIG: Apply 3-4 grams to _____ [Affected Area]
3 times daily.

**Refills:**
1    2    3    4    5
PRN    NR

Yes, I request to enroll in the Auto Refill Program.
**Patient Signature:** _____

**PRINT Doctor Name:** _____ NPI #: _____
Lic #: _____ DEA #: _____
Address: _____
Phone #: _____ Fax #: _____

**Letter of Medical Necessity:** I, the undersigned, certify that the above prescribed compounded medication is medically necessary as part of my treatment for this patient. In my opinion, the medication prescribed is reasonable and necessary for accepted standards of medical practice and treatment of this patient's condition.

**Doctor Signature:** _____ Date: _____

PLEASE REMEMBER: Patient's Drug Benefit Card & Face Sheet in Fax.



# FAX PRESCRIPTION TO : __954-507-4156__

## SPECIALTY COMPOUNDING REQUEST

The patient identfied is requesting a doctor's authorization for the prescription indicated below. Please complete this form and fax it to **954-507-4156**. If you do not include the face sheet, it is imperative that the information under "Patient Information" be completely filled out. If you need assistance contact the office by calling **954-989-6524** .

**Patient Name:**_____  M / F  **DOB:**___/___/___
Home PH #: _____  Cell PH #: _____
Address: _____
City: _____  State: _____  Zip: _____
Allergies:_____  **Insurance Carrier:** _____

**To Accompany This Script:**
Please Include Drug Benefit Card/Info: ID #, Group #, BIN #, Ins. Tel #, Ins. Fax #.
If Workers Comp, Include: Date of Injury, Claim #, Policy #, and Ins. Company Info.

---

☒ **SC-03**

Fluticasone Propionate 1%

Levocetirizine 2%

Pentoxyifllyne 0.5%

Prilocaine 3%

Gabapentin 15%

Pracasil TM plus Base

---

Qty: ☐ 360 gms   ☐ 240 gms 1 pump = 1 gm

SIG: Apply 3-4 grams to _____ (Affected Area)

3 times daily.

**Refills:**

1    2    3    4    5
      PRN    NR

Yes, I request to enroll in the Auto Refill Program.

**Patient Signature:** _____

**PRINT Doctor Name:** _____ NPI #: _____
Lic #: _____ DEA #:_____
Address: _____
Phone #: _____ Fax #: _____

*Letter of Medical Necessity: I, the undersigned, certify that the above prescribed compounded medication is medically necessary as part of my treatment for this patient. In my opinion, the medication prescribed is reasonable and necessary for accepted standards of medical practice and treatment of this patient's condition.*

**Doctor Signature:** _____ Date: _____

## PLEASE REMEMBER: Patient's Drug Benefit Card & Face Sheet in Fax.

| | | | | |
|---|---|---|---|---|
| **Anti Inflammatory** | SPORTS INJURIES OVERUSE SYNDROMES Plantar Fasciitis Tendonitis Bursitis Epicondylitis Osteoarthritis | Standard | Flurbiprofen 20%, Tramadol 5%, Clonidine 0.2%, Cyclobenzaprine 4%, Bupivacaine 1% | #1 - FTCCB |
| | | Advanced | Flurbiprofen 20%, Baclofen 4%, Cyclobenzaprine 2%, Gabapentin 6%, Lidocaine 5% | #5 - FBCGL |
| | | Advanced with Neuropathic | Flurbiprofen 20%, Baclofen 4%, Cyclobenzaprine 2%, Gabapentin 6%, Lidocaine 5% | #5 - FBCGL |
| **Neuropathy** | Chemo-Induced Neuropathy RSD/CRPS General Neuropathy Post-Herpetic Neuralgia Diabetic Neuropathy | Chemo Neuropathic | (Ketamine (C-III) 10% or Amantadine 15%), Gabapentin 6%, Tramadol 8%, Amitriptyline 4%, Cyclobenzaprine 4%, Clonidine 0.2% | #7 - KGTACC |
| | | | Flurbiprofen 20%, Baclofen 4%, Cyclobenzaprine 2%, Gabapentin 6%, Lidocaine 5% | #5 - FBCGL |
| | | Standard Neuropathic | Flurbiprofen 10%, Gabapentin 6%, Nifedipine 7%, Pentoxifylline 5%, Lidocaine 3%, Clonidine 0.2% | #2 - FGNPLC |
| | | | (Ketamine (C-III) 10% or Amantadine 15%), Gabapentin 6%, Nifedipine 7%, Pentoxifylline 5%, Lidocaine 3%, Clonidine 0.2% | #6 - KGNPLC |
| | | Diabetic Neuropathic | (Ketamine (C-III) 10% or Amantadine 15%), Gabapentin 6%, Tramadol 8%, Amitriptyline 4%, Cyclobenzaprine 4%, Clonidine 0.2% | #7 - KGTACC |
| | | | Flurbiprofen 20%, Baclofen 4%, Cyclobenzaprine 2%, Gabapentin 6%, Lidocaine 5% | #5 - FBCGL |
| **Deep Muscle Pain** | Back Pain Myofascial Pain Fibromyalgia Post Laminectomy Pain | Standard with anti-muscle spasm | Flurbiprofen 20%, Tramadol 5%, Clonidine 0.2%, Cyclobenzaprine 4%, Bupivacaine 1% | #1 - FTCCB |
| | | | Flurbiprofen 20%, Baclofen 4%, Cyclobenzaprine 2%, Gabapentin 6%, Lidocaine 5% | #5 - FBCGL |
| | | Advanced Formulation | (Ketamine (C-III) 10% or Amantadine 15%), Gabapentin 6%, Tramadol 8%, Amitriptyline 4%, Cyclobenzaprine 4%, Clonidine 0.2% | #7 - KGTACC |
| | | | Flurbiprofen 20%, Baclofen 4%, Cyclobenzaprine 2%, Gabapentin 6%, Lidocaine 5% | #5 - FBCGL |

All Medicare, Medicaid, Humana, and cash pateints prescribe formula C - MTTLP (Cash Formula)



# FAX PRESCRIPTION TO : 954-507-4156

## SPECIALTY COMPOUNDING REQUEST

The patient identified is requesting a doctor's authorization for the prescription indicated below. Please complete this form and fax it to **954-507-4156**. If you do not include the face sheet, it is imperative that the information under "Patient Information" be completely filled out. If you need assistance contact the office by calling **954-989-6524**.

**Patient Name:** _____   M / F   **DOB:** __ / __ / __

Home PH #: _____ Cell PH #: _____

Address: _____

City: _____   State: _____   Zip: _____

Allergies: _____   **Insurance Carrier:** _____

**To Accompany This Script:**
Please Include Drug Benefit Card/Info: ID #, Group #, BIN #, Ins. Tel #, Ins. Fax #.
If Workers Comp, Include: Date of Injury, Claim #, Policy #, and Ins. Company Info.

---

## ☒ WC03 Gel

Phenytoin 5%

Misoprostol 0.0024%

Aloe Vera 200:1 0.9%

Prilocaine 2%

Levoflaxacin 2%

Carbamazepine 3%

Metronidazole 2%

Vancomycin 5%

---

Qty: ☐ 360 gms   ☐ 240 gms 1 pump = 1 gm

SIG: Apply 3-4 grams to _____ (Affected Area) 3 times daily.

**Refills:**

1   2   3   4   5

PRN   NR

Yes, I request to enroll in the Auto Refill Program.

**Patient Signature:** _____

**PRINT Doctor Name:** _____   NPI #: _____

Lic #: _____ DEA #: _____

Address: _____

Phone #: _____ Fax #: _____

*Letter of Medical Necessity: I, the undersigned, certify that the above prescribed compounded medication is medically necessary as part of my treatment for this patient. In my opinion, the medication prescribed is reasonable and necessary for accepted standards of medical practice and treatment of this patient's condition.*

**Doctor Signature:** _____   Date: _____

## PLEASE REMEMBER: Patient's Drug Benefit Card & Face Sheet in Fax.

# Pertinent ICD-10 Classifications

**2013 ICD-10-CM Diagnosis Code R52, T81.4, E11.21**

**Pain, unspecified, Infection following a procedure**

- On October 1, 2014 ICD-10-CM will replace ICD-9-CM in the United States, therefore, R52, T81.4, E11.21 and all ICD-10-CM diagnosis codes should only be used for training or planning purposes until then. T81.4 is not a specific ICD-10-CM diagnosis code and cannot be used to indicate a medical diagnosis.

**R52 Applicable To**
- Acute pain NOS
- Generalized pain NOS
- Pain NOS

**T81.4 Applicable To**
- Intra-abdominal abscess following a procedure
- Post procedural infection, not elsewhere classified
- Sepsis following a procedure
- Stitch abscess following a procedure
- Subphrenic abscess following a procedure
- Wound abscess following a procedure

**E11.21 Applicable To**
- Type 2 diabetes mellitus with intercapillary glomerulosclerosis
- Type 2 diabetes mellitus with intracapillary glomerulonephrosis
- Type 2 diabetes mellitus with Kimmelstiel-Wilson disease

**Patient Survey**

Name:_____     Age: _____

Phone:_____     Cell:_____     Email:_____

Insurance Type (Circle One):   Medicare;    Medicaid;   Worker's Compensation;   Cash;   Commercial.

If "Commercial", please specify the name of your insurance Carrier: _____

**Check and/or Circle any of the following conditions you are currently experiencing:**

☐ Scarification / Wound Care
☐ Low Back Pain
☐ Neck Pain
☐ Headaches
☐ Joint Pain _____

☐ Post-Operative Wound (problem with scarring)
☐ Numbness / Tingling in Arm or Hand
☐ Numbness / Tingling in Legs or Feet ( Right or Left )
☐ Pain in the Arm / Hand / Leg / Feet ( Right or Left )
☐ Tense Muscles _____

Which Joint?_____

☐ Tendonitis
☐ Epicondylitis
☐ Fibromyalgia
☐ Post-Herpetic Neuralgia
☐ Plantar Fasciitis
☐ Post Laminectomy Pain

Which Muscles?_____

☐ Bursitis
☐ Osteoarthritis
☐ Diabetic Neuropathy
☐ General Neuropathy
☐ Myofascial Pain / RSD / CRPS
☐ Chemo-Induced Neuropathy

**Please answer the following about the above conditions:**

Which of the above conditions is the worst?   _____

On a scale of 1 to 10, how would you rate the pain?   _____

[1 = minimal pain and 10 = severe pain]

How long have you been suffering with this condition?   _____

How is this condition affecting your ability to perform daily tasks?   _____

_____

Would you like to get rid of or reduce this problem?                    ☐ Yes      ☐ No

Have you tried medications that have not helped?                    ☐ Yes      ☐ No

If yes, what have you tried?      ☐ Oral    ☐ Injectable   ☐ Over-the-Counter   ☐ Prescription

I authorize the release of this Patient Survey for use in research and understand that I can revoke this granted permission at any time.

☐ If it were available, I would be interested in receiving a new and alternative non-addictive medication protocol.

_____
Patient Signature

**For Physician Office Use Only: (Patients Please Do Not Enter Any Information Below)**

Today's Date: _____/_____/_____        Circle One:   Male    Female        DOB: _____/_____/_____

ICD-10 Classification:_____